# Supreme Court of Florida

————————

No. SC14-436
————————

**JOHN F. MOSLEY,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————————

No. SC14-2108
————————

**JOHN F. MOSLEY,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[December 22, 2016]

PER CURIAM.

John F. Mosley was convicted of two counts of first-degree murder for the April 2004 deaths of his girlfriend, Lynda Wilkes, and their infant son, Jay-Quan Mosley. He received a sentence of death for the murder of his son, Jay-Quan, and

a sentence of life imprisonment for the murder of Wilkes. This Court affirmed his convictions and sentence of death. Mosley v. State, 46 So. 3d 510 (Fla. 2009).

Mosley now appeals the denial of his initial motion for postconviction relief, filed pursuant to Florida Rule of Criminal Procedure 3.851, and simultaneously petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, §§ 3(b)(1), (9), Fla. Const. For the reasons that follow, we affirm the postconviction court's denial of relief for a new trial but grant Mosley a new penalty phase based on the United States Supreme Court's decision in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and our decision in Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016).

**FACTS**

On direct appeal, this Court summarized the relevant facts as follows:

Although Mosley was married, he had a number of romantic relationships with other women in the Jacksonville area, including Lynda Wilkes. Because Wilkes was receiving Medicaid benefits for their son, Jay-Quan, she was required to participate in a proceeding to establish paternity. After Mosley failed to answer the petition to determine paternity, a default judgment was entered against him, and he was ordered to pay $35 a week in child support, with an additional $5 a week for retroactive child support. On March 12, 2004, Mosley filed a motion to have the final judgment set aside. A hearing on this motion was set for May 3, 2004.

Around this time period, Mosley, who was thirty-nine, met Bernard Griffin, who was fifteen, and asked Griffin if he would be willing to kill a baby. During his attempts to convince Griffin to kill the child, Mosley pointed out Wilkes's house and gave him a sketch of the house's layout, but Griffin refused.

On April 21, 2004, Mosley went to see Wilkes at her house in Jacksonville and asked Wilkes to meet him the next day at J.C. Penney so he could take Jay-Quan shopping. On April 22, 2004, Wilkes took her other children to school. That afternoon, she and Jay-Quan met Mosley at J.C. Penney, and together they left in Mosley's vehicle, a burgundy Suburban. Mosley picked up Griffin, and eventually drove to a deserted dirt road in another part of Jacksonville. Mosley asked Wilkes to get out and pretended to look for something in the seat. He then turned and strangled Wilkes, who futilely attempted to defend herself. After she stopped moving, Mosley took a plastic shopping bag from the back of the vehicle, put it over Wilkes's head, and put her body in the back of the Suburban. Mosley put a crying Jay-Quan in another garbage bag, tied it, and also placed it in the back of his vehicle. He used a blue tarp to cover Wilkes's body and the bag with the baby in it. Initially, Griffin heard the baby crying, but after a while, the baby stopped. Mosley dropped Griffin off and went to work.

Later that evening, while he was still at work, another of Mosley's girlfriends, Jamila Jones, called and asked him for some gas money. He agreed that he would give her some money before she needed to leave for work the next day. That evening, Mosley clocked out of work at 11:01, and sometime after that picked up Griffin again in his Suburban. Griffin noticed that the vehicle smelled bad. Mosley drove out of Jacksonville towards Waldo, which was approximately sixty miles from Jacksonville. A few miles south of Waldo, Mosley turned and went down a number of dirt roads, eventually finding a suitable spot to dispose of Wilkes's body. After Griffin refused to participate, Mosley pulled Wilkes to a clearing by himself, poured lighter fluid over her body, and then tossed a burning rag on her body. As the body began to burn, Mosley and Griffin ran to the vehicle and left. Mosley then drove approximately forty miles further south to Ocala and dumped the trash bag with the baby in a dumpster behind a Winn-Dixie store. He also threw his shoes and gloves into the dumpster. On the way back to Jacksonville, Mosley gave Griffin $100.

Once they arrived in Jacksonville, it was daylight. After asking Griffin to give him back $20, Mosley stopped by Jones's apartment at approximately six that morning and gave her $20. Jones asked Mosley why he did not answer his cell phone when she tried to call him the previous evening, and Mosley replied that he was "doing

something for his mom." Although Mosley was supposed to be back at work at six that same morning, he called in and said that he would be late because he did not get any sleep that night. He finally arrived at work at 12:49 p.m. on April 23.

The victim's family knew something was wrong when Wilkes failed to pick up her children from school on the afternoon of April 22. The family called the police, reported Wilkes as missing, and began a search for her and Jay-Quan immediately. During the evening hours of April 22, they found her car abandoned at the J.C. Penney's parking lot.

On the morning after her disappearance (April 23), one of Wilkes's daughters (Naquita) and a family friend saw Mosley driving his vehicle and caught up to him while he was stopped at a traffic light. They told Mosley that Wilkes was missing. Initially, Mosley denied seeing her. After Naquita asked Mosley whether he failed to show up at J.C. Penney the previous day, Mosley admitted that he saw Wilkes the day before but claimed that he had dropped her off at her car. They asked Mosley if he could pull over, but he refused and drove away.

On Saturday, April 24, Mosley changed all four tires on the Suburban, despite the fact that the tires could be driven for a few more thousand miles. Mosley was adamant that the mechanic load his old tires into his vehicle.

During the investigation into Wilkes's disappearance, the police attempted to contact Mosley numerous times, trying to arrange for an in-person interview. Mosley never met with any police officer until after he was taken into custody, but he did talk to numerous officers over the phone. He claimed that he and Wilkes met at the J.C. Penney's parking lot on April 22 and left to see some nearby houses that Wilkes was considering renting. He further claimed that he dropped her off back at her car around one that afternoon.

Days after the murder, after seeing news reports about the missing woman and baby, Griffin told his mother that he knew something about the case. He then talked to the police and eventually led police to the locations where Mosley killed Wilkes, where he burned her remains, and where he dumped the baby. Griffin was subsequently convicted of two counts of being an accessory after the fact for his involvement in the murders.

Based on Griffin's assistance, the police were able to recover Wilkes's remains, which were badly burned. Wilkes's watch, which

was found with the burned body, stopped at 2:29. Mosley's cellular phone records established that at 2:24 a.m., on April 23, an outgoing call was made from Mosley's cellular phone, and the cellular antenna used for this call was close to where Wilkes's body was found. Despite a diligent search for the baby's body, the baby's body was never recovered.

Wilkes's DNA was found on a carpet sample from the Suburban. The medical examiner testified that after a person was strangled to death, the body could exude pinkish blood from the nose and mouth.

After Mosley was arrested, he wrote Jones a letter, asking her to tell the police that he was alone when he came to her house on April 23 at 6:08 a.m. He also told her, "It is legal and okay to change your statement in court if you let the jury know the police pressured and coerced you to say something before they took the statement and during the statement." Mosley also talked to his wife, Carolyn Mosley, asking her to "remember" that his mother stayed over that night and that he came home from work that night at 11:30. He told his wife that he needed her, their daughters, and his mother to write notarized statements that he arrived home that night at 11:30 and was there all night.

During his defense at trial, Mosley presented evidence through his wife and daughters that he was at home the night that Griffin claimed they disposed of the bodies. Mosley's doctor also testified that he was treating Mosley for some injuries sustained in a car accident. While the doctor discussed Mosley's injuries in depth, he also admitted that the injuries would not have made it impossible for Mosley to lift a body.

Mosley, 46 So. 3d at 514-16 (footnotes omitted). The jury convicted Mosley of two counts of first-degree murder.

Following the penalty phase, the jury recommended a life sentence for the murder of Lynda Wilkes and, by a vote of eight to four, recommended a sentence

of death for the murder of Jay-Quan Mosley. The court held a <u>Spencer</u>[1] hearing and, after independently weighing the aggravating factors and mitigating circumstances, agreed with the jury's recommendation of death for the murder of Jay-Quan. In imposing the death sentence for the murder of Jay-Quan, the trial court found four aggravators applied, each of which was given great weight: (1) the victim of the capital felony was under twelve years of age; (2) the murder was cold, calculated, and premeditated (CCP); (3) the murder was committed for pecuniary gain; and (4) the defendant had been previously convicted of a capital felony (the contemporaneous murder of Wilkes). <u>Mosley</u>, 46 So. 3d at 517 n.6. The trial court determined that twenty-nine nonstatutory mitigating circumstances applied,[2] but found that they were outweighed by the significant aggravation and

---

1. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

2. The trial court found the following mitigators: (1) Mosley was raised in a broken home (little weight); (2) Mosley was an above-average high school student (little weight); (3) Mosley was affected by seeing physical and sexual abuse at an early age (little weight); (4) Mosley has the love and support of family members (some weight); (5) Mosley was a good parent (little to no weight); (6) Mosley was a good and respectful son to his mother, grandmother, and other family members (some weight); (7) Mosley was a good friend to many (some weight); (8) Mosley has shown no homicidal behavior and committed no violent acts since his arrest (little weight); (9) Mosley has the potential to be a productive inmate (some weight); (10) Mosley was a good worker and maintained steady employment throughout his adult life (some weight); (11) Mosley was a patriotic citizen (little weight); (12) Mosley was never disciplined or reprimanded for his performance of his duties while in the Navy Reserve (little weight); (13) Mosley completed an extended program to receive an emergency medical care certificate (some weight); (14) Mosley was a volunteer recreational coordinator for a tenant advisory council

thus sentenced Mosley to death for the murder of his son. On direct appeal, this Court affirmed Mosley's convictions and sentences, including the sentence of death.[3]

_____

(little weight); (15) Mosley completed an extensive program to receive a diploma certificate from the Division of State Fire Marshal for the volunteer basic course (some weight); (16) Mosley successfully completed the certified nursing assistant program from the Department of Health (some weight); (17) Mosley mentored numerous teenagers and helped them with school and other activities (little weight); (18) Mosley is intelligent (little to no weight); (19) the murders were an aberrant act for Mosley that did not fit his life history (little to no weight); (20) Mosley was mentally abused as a child (little weight); (21) Mosley was a Boy Scout in his early years (little weight); (22) Mosley completed law enforcement training (some weight); (23) Mosley coached neighborhood youths in sports and recreation (little weight); (24) Mosley was an active volunteer fireman at two local stations (some weight); (25) Mosley was an active member of the PTA (little weight); (26) the offense and all aggravating factors occurred in an extremely short period of time (little to no weight); (27) Mosley encouraged others to remain in school and complete their education (little weight); (28) Mosley demonstrated appropriate courtroom behavior (little weight); and (29) the State's and the trial court's treatment of Bernard Griffin was mitigating in nature (little weight). As to the last mitigator involving Griffin, the trial court found nothing in the record to suggest that the manner in which the State treated Griffin should mitigate or reduce the sentence imposed against Mosley, particularly since the court found the evidence "quite clear that Bernard Griffin became involved only because the defendant took advantage of a young teenager . . . and turned that teenager into the defendant's assistant." Mosley v. State, 46 So. 3d at 517 n.6.

3. On direct appeal, Mosley raised thirteen claims: (1) [T]he due process clause of the Florida Constitution provides more protection to criminal defendants than the United States Constitution; (2) the prosecutor made improper and inflammatory remarks that deprived Mosley of a fair trial; (3) the trial court erred in admitting the recorded husband-wife jail conversations; (4) the trial court erred in denying Mosley's motion for a continuance and for a mistrial based on a defense witness who failed to appear at trial; (5) the trial court erred in including a videotape of the defendant in shackles and jail garb among the materials delivered to the jury room; (6) the trial court erred in effectively ruling that a double murder

Mosley filed a postconviction motion, raising eighteen claims.[4]  The

postconviction court held an evidentiary hearing in which the following witnesses

---

automatically suffices as the "previously convicted of another capital felony" aggravating circumstance; (7) the trial court erred in denying Mosley's motion for judgment of acquittal; (8) the trial court erred in denying Mosley's motion for a new trial because the guilty verdict was contrary to the weight of the evidence; (9) the trial court erred in denying Mosley's request for the standard jury instruction which concerns pressure or threat against a witness; (10) Florida's death penalty scheme violates the Sixth Amendment and Ring v. Arizona, 536 U.S. 584 (2002); (11) this Court's comparative proportionality review of death sentences is unconstitutional; (12) Mosley's sentence of death is disproportionate; and (13) lethal injection and Florida's lethal injection procedures are unconstitutional. Mosley, 46 So. 3d at 518 n.7.

4.  Mosley raised the following postconviction claims: (1) trial counsel was ineffective in failing to request an alibi jury instruction; (2) trial counsel was ineffective in failing to exercise a cause or peremptory challenge to strike a potential juror who was actually biased; (3) trial counsel was ineffective in failing to present testimony of a deoxyribonucleic acid (DNA) expert at trial to rebut the State's DNA results; (4) trial counsel was ineffective in failing to request a United Frye v. United States, 293 F. 1013 (Dist. D.C. 1923), hearing to exclude the State's DNA evidence as unreliable; (5) trial counsel was ineffective in failing to object to prosecutorial misconduct during closing arguments; (6) the State violated Brady v. Maryland, 373 U.S. 83 (1963), by failing to turn over to defense monitoring logs of a Global Positioning Satellite (GPS) device that was attached to the defendant's vehicle; (7) the defendant was entitled to certain sealed records; (8) the defendant's trial was fraught with procedural and substantive errors; (9) the State violated Brady by failing to inform the defense that Griffin was given a favorable plea and preferential treatment in exchange for his testimony against Mosley; (10) the State violated Giglio v. United States, 405 U.S. 150 (1972), by knowingly presenting Griffin's false testimony that he was not given a plea deal during the trial against Mosley; (11) trial counsel was ineffective in failing to investigate and present critical documents at trial or failing to call known and available witnesses; (12) trial counsel was ineffective in discussing Mosley's extramarital relationships in front of the jury; (13) trial counsel was ineffective in failing to file a motion to obtain the transcripts from the grand jury proceedings and failing to file a motion to dismiss the indictment; (14) the evidence used to convict him was insufficient;

testified: John Mosley himself, Bernard Griffin, Mosley's trial attorneys, Mosley's

private investigator, various detectives and police officers who worked on the

murder investigation, and the State Attorney's investigator.

After considering the testimony, the postconviction court denied relief. This

appeal follows. Mosley also petitions this Court for a writ of habeas corpus.

**ANALYSIS**

**I. Rule 3.851 Claims**

On appeal to this Court, Mosley raises numerous claims challenging the

postconviction court's denial of relief. In his first three claims, Mosley alleges that

he is entitled to relief based on violations of <u>Brady</u> and <u>Giglio</u>, and a claim of

newly discovered evidence—claims that all involve whether the State's key

witness, Bernard Griffin, had an undisclosed plea deal with the State or was given

favorable treatment in exchange for his damaging testimony against Mosley. In

addition, Mosley alleged that his trial counsel was deficient in failing to move to

strike a certain juror, to request an alibi jury instruction, and to object to improper

---

(15) trial counsel was ineffective in failing to file motions to suppress irrelevant evidence that misled the jury; (16) trial counsel was ineffective in failing to challenge a material variance in the indictment; (17) Mosley's constitutional rights were violated by a material variance in the indictment; and (18) newly discovered evidence demonstrates that Griffin lied at trial when he testified that he did not have a deal with the State. He also asserted that Florida's capital sentencing statute is unconstitutional.

statements by the prosecutor.  Finally, Mosley contends that he is entitled to relief based on cumulative error.

## A. Undisclosed Favorable Treatment of the State's Key Witness

Mosley first contends that he recently learned that the State's key witness, Bernard Griffin, was given favorable treatment both before he testified and afterwards—information that was previously not disclosed—and this information entitles him to relief.  Mosley brings this claim alternatively under Brady, Giglio, and newly discovered evidence.

In Mungin v. State, 79 So. 3d 726, 734 (Fla. 2011), this Court explained the differences between these three claims.  To establish a Brady claim:

> [T]he defendant must demonstrate that (1) favorable evidence, either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Way v. State, 760 So. 2d 903, 910 (Fla. 2000).  To meet the materiality prong, the defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Way, 760 So. 2d at 913 (quoting United States v. Bagley, 473 U.S. [667,] 682 [(1985))].  A reasonable probability is a probability sufficient to undermine this Court's confidence in the outcome.  Id.; see also Strickler, 527 U.S. at 290.  However, in making this determination, a court cannot "simply discount[ ] the inculpatory evidence in light of the undisclosed evidence and determin[e] if the remaining evidence is sufficient."  Franqui v. State, 59 So. 3d 82, 102 (Fla. 2011).  "It is the net effect of the evidence that must be assessed."  Jones v. State, 709 So. 2d 512, 521 (Fla. 1998).

Id. (second set of alterations in original).  In contrast, under Giglio,

"[A] defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." Rhodes v. State, 986 So. 2d 501, 508-09 (Fla. 2008). As to the knowledge prong, in Guzman v. State, 868 So. 2d 498 (Fla. 2003), we have clarified that Giglio is satisfied where the lead detective testifies falsely at trial because the "knowledge of the detective . . . is imputed to the prosecutor who tried the case." Id. at 505.

The materiality prong of Giglio is more defense-friendly than in a Brady claim. See Davis v. State, 26 So. 3d 519, 532 (Fla. 2009) ("[T]he standard applied under the third prong of the Giglio test is more defense friendly than the test . . . applied to a violation under Brady."). While under Brady, evidence is material if a defendant can show "a reasonable probability that . . . the result . . . would have been different," Way, 760 So. 2d at 913 (emphasis added), under Giglio, the evidence is considered material simply "if there is any reasonable possibility that it could have affected the jury's verdict." Rhodes, 986 So. 2d at 509 (emphasis added).

Id. at 738. Finally, in order to prevail under a newly discovered evidence claim, (1) "the evidence must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of the evidence] by the use of diligence"; and (2) the evidence "must be of such nature that it would probably produce an acquittal on retrial." Id. (quoting Jones, 709 So. 2d at 521).

In this case, the postconviction court, after holding an evidentiary hearing, denied this claim based on specific findings that Mosley's witnesses were not as credible as the State's witnesses, including the prosecutor who testified that no deal existed. In an extremely detailed order, the postconviction court explained its findings of fact and conclusions of law in denying the Brady claim as follows:

- 11 -

The State charged Mr. Griffin with two counts of accessory after the fact for the murders of Ms. Wilkes and Jay-Quan. This offense is a first degree felony, punishable by up to thirty years in prison. At the time of Defendant's trial, Mr. Griffin maintained a not guilty plea. Mr. Griffin later pleaded guilty to these charges and was sentenced to two years of community control, followed by eight years of probation.

At Defendant's trial, Mr. Griffin stated he agreed to testify truthfully, he did not know how much time he was facing, no one promised anything in exchange for his testimony, the prosecutors never suggested what sentence the court would impose, and he did not hope to get some benefit from testifying against Defendant. When asked if the State promised to get him a job, Mr. Griffin said, "No. Ain't even bring up nothing like that." Mr. Griffin also testified that the prosecutors did not talk to him about what would happen at the trial.

In a phone call with his aunt, Mr. Griffin said, "Yeah, he said I won't be getting no prison time or nothing like that," and "They going to help me get a job when I get out." At trial, Mr. Griffin admitted that he lied to his aunt to reassure his family that he was fine.

Defendant's postconviction counsel presented an affidavit at the evidentiary hearing that Mr. Griffin signed on January 7, 2013, wherein Mr. Griffin made thirteen assertions, including the following pertinent assertions: (4) Mr. Griffin was brought to the State Attorney's Office "dozens of times" to meet with Ms. Senterfitt, the lead prosecutor on Defendant's case; (5) John Guy, another prosecutor, joined Ms. Senterfitt at four or five of these meetings; (6) Ms. Senterfitt told Mr. Griffin the State would charge him with first-degree murder if he did not cooperate with and testify for the State, and the prosecutors discussed Mr. Griffin's trial testimony and his prior inconsistent statements; (7) Mr. Griffin did not enter a plea before testifying in Defendant's case, and Ms. Senterfitt "repeatedly" assured Mr. Griffin that if he cooperated he would get little jail time and/or probation; (9) Mr. Griffin told his grandmother, prior to trial, the truth when he said he was not going to get prison time and that somebody was helping him; (10) the State gave Mr. Griffin Chinese food for dinner the night before he testified in Defendant's trial, and Defendant ate the food in Ms. Senterfitt's office; (11) Ms. Senterfitt told Mr. Griffin to deny he had a deal with the State if defense counsel asked him because admitting the deal would harm the State's case;

- 12 -

(12) Mr. Griffin's trial testimony that he did not have a deal was false because he did have a deal with the State whereby he was going to get little or no jail time and probably just probation; and (13) Mr. Griffin entered a plea and was sentenced to community control and probation.

At the evidentiary hearing, Mr. Griffin testified the affidavit was accurate. Additionally, he testified that he violated his probation "two or three times" and is currently serving a twenty-year sentence in state prison. Mr. Griffin stated that neither Ms. Senterfitt nor Mr. Guy helped him on his last violation and that they should have helped him. Mr. Griffin also revealed that the prosecutor "John Guy" brought him the Chinese food, that he did not pay for the food, and that he ate the food alone in Ms. Senterfitt's office. Mr. Griffin testified Mr. John Guy, the same state attorney who prosecuted Defendant and who was cross examining Mr. Griffin at the evidentiary hearing, was not the John Guy who brought him the Chinese Food. According to Mr. Griffin, having the Chinese food did not affect his trial testimony. Finally, Mr. Griffin testified that he "didn't lie at all" at trial about Defendant murdering Ms. Wilkes and Jay-Quan or about Defendant disposing of the bodies.

Judge Senterfitt[5] testified at the evidentiary hearing that at the time of trial Mr. Griffin had maintained his not guilty plea. She reported meeting with Mr. Griffin approximately five times prior to trial to discuss his testimony, including his prior inconsistent statements to the police as she would normally do with witnesses. Judge Senterfitt stated that an investigator and/or Mr. Guy would be present at these meetings.

Judge Senterfitt explained that there was no need to tell Mr. Griffin that the State would charge him with a higher crime than accessory after the fact if he failed to cooperate, because Mr. Griffin "was always completely cooperative," and she "certainly wouldn't have threatened him." According to Judge Senterfitt, she would not have put Mr. Griffin on the stand if she "thought maybe he wasn't really being honest" and that the whole point was that she was convinced he was telling the truth.

---

5. Ms. Senterfitt became "Judge" Senterfitt after serving as the prosecutor in Mosley's case.

- 13 -

I told him to tell the truth. Bernard, I can't—I don't know what you're going to get. I can't tell you what you're going to get. I just—you need to keep doing what I think—you know, what you've been doing and that is telling the truth.

Judge Senterfitt testified that she did not tell Mr. Griffin what sentence he would receive because to do so would defeat the whole purpose of using him as a witness as it would cause Mr. Griffin to lose credibility with the jury, but that she and Mr. Griffin's attorney would have told Mr. Griffin his sentencing range—anywhere between probation and thirty years. Judge Senterfitt said that she did not think anyone else would tell Mr. Griffin he could receive more time if he did not cooperate. Judge Senterfitt agreed that she and Mr. Guy were responsible for the prosecution of the case and that "nobody in the State Attorney's Office would have made—had the authority to make any sort of proposals to Mr. Griffin if that had happened[.]"

Judge Senterfitt testified that although she did not remember the details of Mr. Griffin's telephone call with his grandmother, she must have asked Mr. Griffin about it. She also admitted that it sounded vaguely familiar that Mr. Griffin was given Chinese food and that "[i]t's very possible that if we had him a little late in my office that we would—knowing that he was going to miss dinner over at the jail that we would have said, you know, Bernard, we can get you something to eat . . . ." Judge Senterfitt testified that she would have prepared Mr. Griffin to answer truthfully when he was asked on the stand if he had a deal with or promise from the State because she had not promised him anything, and he did not have a deal with the State.

Judge Senterfitt, relying on Mr. Griffin's plea form, acknowledged that Mr. Griffin was sentenced to two years of community control, followed by approximately eight years of probation. According to Judge Senterfitt, when she recommended a sentence for Mr. Griffin, she considered: Mr. Griffin's cooperation with the police and State, Mr. Griffin's age, Mr. Griffin's role in the murders of Ms. Wilkes and Jay-Quan, and Mr. Griffin's prior record. Because she did not know what Mr. Griffin's cooperation at trial would ultimately be, she would not be able to make a sentencing recommendation before trial.

After listening to the testimony of the witnesses, the Court finds that Judge Senterfitt's testimony is both more credible and more

persuasive than Defendant's allegations and Mr. Griffin's testimony. See Griffin v. State, 114 So. 3d 890, 905 (Fla. 2013); Sochor v. State, 883 So. 2d 766, 785 (Fla. 2004); Kight v. Dugger, 574 So. 2d 1066, 1073 (Fla. 1990).

Neither Ms. Senterfitt nor anyone else on behalf of the State Attorney's Office told Mr. Griffin he would be charged with first degree murder if he did not cooperate; the State reasonably discussed Mr. Griffin's trial testimony and reviewed his prior inconsistent statements to the police; Ms. Senterfitt did not assure Mr. Griffin that if he cooperated by testifying against Defendant at trial, he would receive little jail time and/or probation; Mr. Griffin did not have a deal with the State when he called his grandmother from the jail and, therefore, Mr. Griffin told the truth at trial; whether the State gave Mr. Griffin Chinese food is immaterial and not evidence of lenient treatment; and Ms. Senterfitt did not tell Mr. Griffin to lie at trial to deny he had a plea deal with the State—she told Mr. Griffin to be honest because Mr. Griffin did not have a plea deal with the State at the time of trial. Even though the State prepared Mr. Griffin for trial, which Mr. Griffin denied at trial, this preparation is routine practice for attorneys. There is not a reasonable probability that had the jury known this it would change the outcome of the proceedings.

Defendant is unable to establish Mr. Griffin's trial testimony, denying favorable treatment from the State, was false. The State did not have a plea deal with Mr. Griffin before he testified at Defendant's trial; consequently, the State did not have exculpatory evidence for the defense that would impeach Mr. Griffin's testimony or damage Mr. Griffin's credibility with the jury. Defendant does not satisfy the first prong of Brady and the Court need not address the other prongs. Defendant is not entitled to relief . . . .

(Footnote omitted.) Likewise, the postconviction court relied on these findings to

deny Mosley's Giglio claim:

The Court found, supra, that Defendant's testimony at trial was not false. Defendant is, therefore, unable to establish the first prong of the Giglio analysis. Consequently, there is no need for the Court to address the other two prongs. Defendant is not entitled to relief in [this claim].

- 15 -

Likewise, in denying the newly discovered claim, the postconviction court found:

As the Court determined in resolving [the Brady claim], supra, Judge Senterfitt's testimony at the evidentiary hearing that Mr. Griffin did not have a plea deal with the State when he testified at Defendant's trial is more credible and persuasive than Mr. Griffin's testimony at the evidentiary hearing and assertions in his Affidavit that he did have a plea deal prior to testifying at Defendant's trial. Consequently, Mr. Griffin's testimony at Defendant's trial that he did not have a plea deal with the State was accurate. Defendant is not entitled to relief . . . .

This Court reviews the trial court's findings of fact and determinations as to the credibility of witnesses and the weight of the evidence for competent, substantial evidence. Porter v. State, 788 So. 2d 917, 923 (2001). Brady claims present mixed questions of law and fact. Where the postconviction court has conducted an evidentiary hearing, this Court will defer to the factual findings of the postconviction court so long as those findings are "supported by competent, substantial evidence, but will review the application of the law to the facts de novo." Mungin v. State, 141 So. 3d 138, 142 (Fla. 2013). As we have explained, this Court is highly deferential to the postconviction court and "will not substitute its judgment for that of the trial court on . . . the credibility of the witnesses and the weight to be given to the evidence." Wyatt v. State, 71 So. 3d 86, 105 (Fla. 2011) (quoting Cherry v. State, 959 So. 2d 702, 709 (Fla. 2007)). This is because the postconviction judge, who is present at the hearing, "has a superior vantage point to see and hear the witnesses presenting the conflicting testimony." Id. (quoting

- 16 -

State v. Spaziano, 692 So. 2d 174, 178 (Fla. 1997)). This case involves the testimony of a recanting witness, which this Court has observed is, "as a general matter, 'exceedingly unreliable.' " Spann v. State, 91 So. 3d 812, 816 (Fla. 2012) (quoting Bell v. State, 90 So. 2d 704, 705 (Fla. 1956)).

Upon a full review of the record, the postconviction court's order, and the parties' arguments, we deny this claim because competent, substantial evidence supports the postconviction court's findings. In attempting to establish this claim, Mosley relied primarily on the testimony of Griffin—a witness who the postconviction court determined was not credible. Not only did Griffin's testimony lack a significant amount of detail concerning any alleged plea or understanding between himself and the prosecutor, but it also lacked any corroboration from other witnesses. For example, although Griffin also stated that his defense attorney, John Whited, "[p]retty much" knew about this deal prior to Mosley's trial, when asked specific questions about what occurred and who was there, Griffin was unable to answer, stating, "I can't remember. It was so long ago." Further, because Mosley's trial attorney, Richard Kuritz, was personal friends with Griffin's attorney, Whited, Kuritz called Whited before Mosley's trial to inquire whether Griffin had been given any plea or whether promises were made. Whited indicated that no promises were made.

Not only was Griffin's new testimony lacking in supporting evidence, but Griffin's own testimony was internally inconsistent in numerous instances. Griffin often contradicted his own testimony or statements made previously in his affidavit. In contrast, the State presented Mosley's former prosecutor, Elizabeth Senterfitt, who is now a circuit court judge. Judge Senterfitt explicitly denied that an undisclosed plea deal existed or that the State provided any favorable treatment.

Determining the merits of this claim involved weighing conflicting testimony, primarily between that of Griffin and Judge Senterfitt. All of Mosley's claims rest on the foundation that there was some promise of leniency in exchange for Griffin's testimony—a claim that the postconviction court found to be not credible. The postconviction court made explicit findings that Judge Senterfitt did not assure Griffin that if he testified against Mosley, Griffin would receive little jail time; that Griffin did not have a deal with the State and therefore told the truth at trial; and whether the State gave Griffin dinner at dinner time was not evidence of lenient treatment. These findings are supported by competent, substantial evidence. While Griffin provided little detail regarding the most relevant parts of his testimony and often contradicted himself, Judge Senterfitt's testimony was clear. This Court is highly deferential to the postconviction court's factual findings and "will not substitute its judgment for that of the trial court on . . . the credibility

of the witnesses and the weight to be given to the evidence." Wyatt, 71 So. 3d at

105 (quoting Cherry, 959 So. 2d at 709).

Mosley is not entitled to relief on these three claims.

## B. Ineffective Assistance of Trial Counsel

In his other postconviction claim, Mosley contends that trial counsel

rendered ineffective assistance based on three alleged failures. First, Mosley

contends that trial counsel was deficient for failing to strike a juror—a claim that

the postconviction court summarily denied. Second, Mosley alleges that trial

counsel was deficient for failing to request a jury instruction on the alibi defense.

Third, he asserts trial counsel was deficient in failing to object to various improper

comments made by the prosecutor. We address each claim in turn.

Generally, as this Court has explained, to prevail on a claim that counsel was

ineffective, the defendant must demonstrate:

> both that trial counsel's performance was deficient and that the
> deficient performance prejudiced the defendant so as to deprive him
> of a fair trial. Strickland v. Washington, 466 U.S. 668 (1984). As to
> the first prong, the defendant must establish that "counsel made errors
> so serious that counsel was not functioning as the 'counsel'
> guaranteed the defendant by the Sixth Amendment." Id. at 687. For
> the second prong, "Strickland places the burden on the defendant, not
> the State, to show a 'reasonable probability' that the result would have
> been different." Wong v. Belmontes, 558 U.S. 15 (2009) (quoting
> Strickland, 466 U.S. at 694). Strickland does not "require a defendant
> to show 'that counsel's deficient conduct more likely than not altered
> the outcome' of his penalty proceeding, but rather that he establish 'a
> probability sufficient to undermine confidence in [that] outcome.' "
> Porter v. McCollum, 558 U.S. 30, 130 S. Ct. 447, 455-56 (2009)

- 19 -

(quoting Strickland, 466 U.S. at 693-94). This Court employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

Smith v. State, 126 So. 3d 1038, 1042-43 (Fla. 2013).

### 1. Failure to Strike a Juror

In Carratelli v. State, 961 So. 2d 312, 320 (Fla. 2007), this Court discussed, in-depth, how the Strickland standard applies to the claim that trial counsel was ineffective in failing to move to strike a juror and contrasted the standard applied during postconviction proceedings with the standard that applies to a similar claim raised on direct appeal:

> [T]he standard for obtaining a reversal upon the erroneous denial of a cause challenge is relatively lenient: a defendant need only show that an objectionable juror—whether or not actually biased—sat on the jury. Our consideration of postconviction claims, however, is more restrictive. As we recently reiterated:
> > We have emphasized that "once a conviction has been affirmed on direct appeal 'a presumption of finality and legality attaches to the conviction and sentence.' " . . . "[T]he test for prejudicial error in conjunction with a direct appeal is very different from the test for prejudice in conjunction with a collateral claim of ineffective assistance."
> Sanders [v. State], 946 So. 2d [953, 959 (Fla. 2006)] (citations omitted) (quoting Goodwin v. State, 751 So. 2d 537, 546 (Fla. 1999), and Sanders [v. State,] 847 So. 2d [594, 506 (Fla. 1st DCA 2003)]). A defendant's claim that his counsel offered ineffective assistance at trial, for whatever reason, must be analyzed under the standard the Supreme Court enunciated in Strickland. The purpose of the right to the effective assistance of counsel is to "ensure a fair trial," Strickland, 466 U.S. at 686, defined as "one in which evidence subject

to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." Id. at 685.

. . . .

Specifically, the Court stressed that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. Therefore, "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." Witt v. State, 387 So. 2d 922, 925 (Fla. 1980) (quoting United States v. Addonizio, 442 U.S. 178, 184 (1979)).

Carratelli, 961 So. 2d at 320. In order to establish that the defendant suffered prejudice based on counsel's failure to strike a juror during voir dire, the defendant must demonstrate that an actually biased juror served on the jury. Id. at 323.

When this Court previously applied that standard to the facts in Carratelli, this Court held that the defendant failed to prove prejudice—that an actually biased juror served on the jury—even though the defendant did show that one of the jurors read a prior news article about the crime and was exposed to a prior conversation where numerous people had opined to him that the defendant was guilty. While the juror in question acknowledged that it might be more difficult for the defendant to convince the juror of his innocence based on the juror's prior exposure, the juror still stated, "If I come in here as a juror, I will sit down with an open slate and listen to what is said and make up my mind from there." Id. at 327. As this Court concluded, "The record plainly shows that [the juror] held no firm opinion except that he could be fair, listen to the evidence, and follow the law." Id.

This Court has reviewed similar claims involving ineffective assistance of trial counsel pertaining to the failure to challenge a juror for cause and has generally held that in order to amount to actual bias, the juror must indicate something more than mere doubt about that juror's impartiality. See, e.g., Guardado v. State, 176 So. 3d 886 (Fla. 2015) (holding that the record did not show a juror had actual bias even though the juror stated that he was "strongly" in favor of the death penalty, knew three of the police officers who worked on the case, and had family members who knew the victim personally); Johnston v. State, 63 So. 3d 730, 745 (Fla. 2011) (holding that the record did not show a juror had actual bias when the juror stated that he had been exposed to pretrial publicity about the crime and then declined to respond to specific discussion on bias during voir dire); Owen v. State, 986 So. 2d 534, 550 (Fla. 2008) (holding that there was no evidence of actual bias in the record where a juror stated that she "[p]robably" would vote for the death penalty in the circumstance of multiple victims but ultimately stated that mitigating evidence such as testimony about the defendant's mental health could influence her to recommend a life sentence).

Applying that standard, during the voir dire in this case, when the State inquired whether any juror was concerned about whether he or she would be so bothered by photographs of the deceased victim's burned and decomposed body that he or she could not be fair or impartial, Juror R answered that she was not sure

how she would respond and that she did not know, although she thought she would try. Specifically, in response to a compound question, asking the jurors both as to who would be bothered or disturbed by reviewing photographs of the victim's burned, decomposed body and who would feel that such pictures would cause them to not be fair and partial, Juror R responded, stating, "I'm not sure how I would respond. I think the timing of when we see them might determine how I might feel. I just don't know." When the State explained that this was a part of the case and questioned whether she could be fair and impartial in the case, Juror R then replied, "I think I would try but I don't know what I would take home with me at night and sleep with. I don't know."

We deny this claim because Mosley has failed to show <u>actual</u> bias on the face of the record. As this Court explicitly held in <u>Johnston</u>, in order to prevail on a challenge pertaining to whether trial counsel was ineffective in failing to object to certain jurors serving on the jury, the defendant must demonstrate actual bias, which is "more than mere doubt about the juror's impartiality." 63 So. 3d at 745. Based on the full context of Juror R's statement, Juror R was replying to whether those types of pictures would bother her or affect her ability to sit as a juror in the case—she did not clearly indicate that she would have a bias or prejudice against a particular party or determine Mosley's guilt or innocence based on gruesome pictures.

- 23 -

Even if her statements were considered to be a discussion as to whether she could be fair, Juror R's statements merely express doubt, which this Court has held does not establish actual bias against the defendant. As this Court has acknowledged, the standard for establishing prejudice during postconviction claims must be more restrictive in order to recognize "the fundamental differences between review on appeal and review on postconviction." Thompson v. State, 990 So. 2d 482, 489 (Fla. 2008). We stressed in Carratelli that holding otherwise would mean that "[a] defendant asserting ineffective assistance for failing to preserve a cause challenge would have no greater burden than a defendant asserting preserved error on appeal," a result that would lead to the elimination of the contemporaneous objection requirement and permit counsel to save certain arguments for appeal. 961 So. 2d at 325. We thus deny this claim.

### 2. Failure to Request a Jury Instruction on the Alibi Defense

In his second claim of trial counsel deficiency, Mosley alleges that trial counsel was deficient in failing to request a jury instruction pertaining to an alibi defense. Specifically, at his trial, the State presented evidence that Mosley himself admitted to meeting the victims at J.C. Penney during the time frame within which the police later determined the murders occurred. Mosley presented evidence to challenge his involvement in the murder, and his counsel's theory of defense was that Griffin had killed the victims and blamed Mosley for the crime. Defense

counsel stressed that there was no physical evidence to show that Mosley was present at the scene of the crime and demonstrated the small window of time that Mosley was even available to be able to commit the offenses.

At the postconviction evidentiary hearing, Mosley's lead trial counsel testified, asserting that he researched the case thoroughly and generated a case file of fourteen boxes. Defense counsel explicitly stated that he never believed that this was an alibi case and he was concerned about his credibility with the jury if he attempted to rely on such a defense based on the available evidence. Instead, his defense strategy was to chip away at the State's case, demonstrate its lack of direct evidence against Mosley, and stress that Griffin committed the murder. The postconviction court denied the claim as follows:

> Evidence from cell phone records showed the murders occurred between 12:33 p.m. and 1:21 p.m. JSO Detective Dennis Fuentes interviewed Defendant after Defendant became a suspect in the disappearance of Ms. Wilkes and Jay-Quan. At trial, Detective Fuentes testified that Defendant told the detective he saw Ms. Wilkes and Jay-Quan between 12:30 p.m. and 1:00 p.m. on the day of the murders. Defendant also told the detective that during this time Ms. Wilkes showed Defendant a house she was thinking about renting and afterwards they returned to the J.C. Penney parking lot where Ms. Wilkes performed oral sex on Defendant.
>
> JSO Sergeant Hugh Eason also interviewed Defendant during the investigation into Ms. Wilkes's and Jay-Quan's disappearances. According to Sergeant Eason, Defendant said he called Ms. Wilkes from Quality Tire before meeting her at "around 12:45, 1:00 . . ." and that he never said anything about going back to Quality Tire after leaving Ms. Wilkes and Jay-Quan. At trial Jimmy Holton, the manager of Quality Tire, testified that he was merely guessing that Defendant was in his shop at 1:00 p.m. on the day of the murders and

that he could not say exactly what time Defendant was there that day. Jim Jeanette, the plumber who worked on Defendant's broken toilet, testified that he arrived at Defendant's home at 3:00 p.m. on the day of the murders. Defendant's daughter, Amber Mosley, testified that she saw Defendant at home "[s]ometime around 1:00" the day of the murders. Finally, Defendant's wife, Carolyn Mosley, testified that she was uncertain where Defendant was between 12:00 noon and 1:00 p.m. on the day of the murders.

Mr. Kuritz testified at the evidentiary hearing that he "never thought of this as an alibi case." According to Mr. Kuritz, he could not show Defendant was in a particular place at a specific time. Because he believed he did not have enough evidence for an alibi, counsel tried to "chip away at the state's case and show that their [sic] story wasn't credible." Mr. Kuritz explained that his theory and strategy were to argue that Mr. Griffin committed the murders "either by himself or with a friend of his and that Mr. Mosley was not involved."

Mr. Kuritz believed that had he requested an alibi instruction he would have lost credibility with the jury and that "the state could have really twisted it on me . . . because as I sit here still I don't think we had an alibi to speak." Finally, Mr. Kuritz testified that when he did not have sufficient evidence to sustain an alibi instruction, he relied on the jury finding "plenty of reasonable doubt as to all of this."

At the evidentiary hearing, Quentin Till, co-counsel at Defendant's trial, testified that he focused on the penalty phase. He further testified that he was unsure whether he actually sat down with Mr. Kuritz to discuss the defense's theory for the guilt phase. Mr. Till explained he was very confident with Mr. Kuritz's capabilities to represent somebody. According to Mr. Till, the defense could have put on an alibi defense, but he was unsure whether it would be effective. He further stated that he did not have an answer to whether there was harm in asking for an alibi instruction.

Defendant argues that Mr. Kuritz's reasons for not requesting an alibi instruction is unconvincing because counsel "used the word 'alibi' in describing Mosley's defense to the jury." In his opening statement, Mr. Kuritz made these references to an alibi: "[The plumber is] not going to say Defendant was trying to set up an alibi"; "Nobody is crunching for alibis"; "Not us making up an alibi"; and "That's his alibi?"

Mr. Kuritz's strategic decision not to request an alibi instruction was clearly within "the broad range of reasonably competent performance" contemplated by Strickland. Although Mr. Kuritz used the word "alibi" during his opening statement, he never directly referred to a specific alibi defense. Counsel considered whether to pursue an alibi defense and reasonably rejected doing so after reviewing the undisputed facts and concluding that Defendant did not have a sufficient alibi.

We affirm the postconviction court's determination that this was a reasonable strategic decision. As this Court has held, "[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Peterson v. State, 154 So. 3d 275, 280 (Fla. 2014) (quoting Burns v. State, 944 So. 2d 234, 239 (Fla. 2006)). Even if "arguably trial counsel's strategy may have ultimately been unsuccessful, [the defendant] cannot now properly challenge an informed, strategic decision of counsel in the hindsight of postconviction." Dufour v. State, 905 So. 2d 42, 62 (Fla. 2005). "The defendant bears the burden to 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.' " McCoy v. State, 113 So. 3d 701, 707 (Fla. 2013) (quoting Strickland, 466 U.S. at 689).

Mosley now asserts that counsel should have requested this jury instruction even if the evidence was weak, emphasizing that trial counsel presented witnesses who testified that Mosley could have been in a different place during the murder or when the bodies were disposed of and thus he must have been presenting an alibi

defense. As trial counsel testified during the postconviction evidentiary hearing, however, Kuritz never considered the case as one involving an alibi. His stance on this was clear to the jury from the opening argument—he repeatedly emphasized that he was "<u>not</u> going to say Mr. Mosley was trying to set up an alibi" and they are not "making up an alibi."

A review of the trial record very clearly demonstrates why choosing not to use an alibi defense was a reasonable strategic decision. By Mosley's own admissions to numerous people, he could have been present at the very time that the murders occurred. Mosley initially asked the victim to meet him in the J.C. Penney parking lot so he could allegedly buy their son clothing. Wilkes notified others of her plan to meet Mosley at J.C. Penney, and her car was found abandoned in the parking lot where she met Mosley. When the police confronted Mosley about this, he acknowledged that he met Wilkes and their son there and was with her during the relevant time period. Thus, while trial counsel did call various witnesses who would have placed Mosley at home around 1 p.m., if trial counsel focused on using this as a defense, the State would have emphasized that even Mosley himself initially admitted that he was with Wilkes during the time that the police were later able to establish the murders occurred—between 12:57 and 1:21 p.m.

Further, after Mosley was arrested, he contacted numerous people in an attempt to create an alibi. He called his family from jail, explaining what statements he wanted them to provide to the police. Mosley also reached out to one of his other mistresses by letter, encouraging specific testimony that she should recall pertaining to when they saw each other on April 23—the time period when Mosley returned from disposing of the bodies. If trial counsel had attempted to pursue this case as one involving an alibi, the prosecutor had significant evidence to suggest that Mosley was attempting to fabricate an alibi. Instead, trial counsel attempted to downplay this evidence, stressing that Mosley was not trying to create an alibi and that he was just worried that his family and friends would be pressured into lying about important details. Trial counsel focused on how the only evidence that tied Mosley to the murder came from Griffin, who was also being charged with crimes concerning the murder, and that Griffin was trying to blame Mosley for murders that Griffin himself committed.

We deny this claim.

### 3. Failure to Object to Improper Comments

In his final claim, Mosley contends that trial counsel rendered deficient performance in failing to object to certain statements made by the prosecutor and State witnesses, focusing on four main areas: (1) trial counsel failed to object to improper bolstering of Griffin and the police; (2) the prosecutor denigrated Mosley

- 29 -

and his defense; (3) during the penalty phase, the prosecutor relied on prosecutorial expertise in seeking the death penalty; and (4) the prosecutor implied to the jury that a life recommendation is the "easy way out."[6]

As an initial matter, during the postconviction hearing, trial counsel Richard Kuritz testified that, as a strategic choice, he was generally more conservative in how many objections he raised, objecting only where it was clear that the statement was improper and where his objection would be helpful to the defense. The postconviction court relied on this testimony, summarizing Kuritz's testimony as follows:

> Mr. Kuritz testified that his use of objections is strategic. He testified that forming his strategy is a two-part process: Can I object? Should I object? Mr. Kuritz explained that if he objects too much, he might "get the ire of the court," and he might lose credibility with the jury. He further explained that an objection may draw the jury's attention to particular testimony that is damaging to his client and by not objecting, he does not give the jury a reason to pay attention to the damaging testimony. According to Mr. Kuritz, "the jury can't unhear something or unring the bell." Finally, Mr. Kuritz considers whether to use the prosecutor's statement to his benefit: "I like it when an opposing party says something that I can use to my benefit and oftentimes it's when they say something ludicrous, improper or pushing the envelope that I can twist on that."

---

6. In light of granting Mosley relief with respect to relief on his claim under Hurst v. Florida, 136 S. Ct. 616 (2016), and remanding his case for a new penalty phase, we do not address Mosley's claims (3) and (4), which relate to his attorney's failure to object to statements made during the penalty phase of his trial.

Mosley first contends that his attorney was deficient in failing to object to various statements from the State that allegedly constituted improper bolstering and from State witnesses regarding Griffin's credibility and the investigation in the case. This Court has defined improper bolstering as "when the State 'places the prestige of the government behind the witness or <u>indicates that information not presented to the jury supports the witness's testimony</u>.' " Jackson v. State, 147 So. 3d 469, 486 (Fla. 2014) (quoting Wade v. State, 41 So. 3d 857, 869 (Fla. 2010)). After reviewing each of these arguments, we conclude that these comments, when viewed in context, are not comments placing the prestige of the government behind Griffin's testimony or relying on anything outside of the record to support law enforcement's testimony. Further, even if these comments could constitute improper bolstering, trial counsel was not deficient in failing to object to the comments, but in fact used some of the statements to Mosley's advantage by suggesting that the law enforcement officers had clouded judgment pertaining to Griffin.

Second, Mosley contends that trial counsel was deficient in failing to object to numerous statements in closing arguments wherein the prosecutor argued that Mosley had lied to various people, alleging that such statements denigrated the defendant. This Court has held that while a prosecutor may "not ridicule or otherwise improperly attack the defense's theory of the case," the prosecutor is

permitted to suggest to the jurors that "based on the evidence of the case, they should question the plausibility of the defense's theory." Davis v. State, 136 So. 3d 1169, 1203 (Fla. 2014) (quoting Valentine v. State, 98 So. 3d 44, 55-56 (Fla. 2012)). Accordingly, this Court has previously "determined that the prosecutor's description of the defendant's testimony as 'untruthful[ ]' or of the defendant as a 'liar' was proper argument based on the evidence of the case." Id. at 1204 (quoting Craig v. State, 510 So. 2d 857, 865 (Fla. 1987)); see also Davis v. State, 698 So. 2d 1182, 1190 (Fla. 1997) (concluding that prosecutor's reference to defendant's statements as "bald-faced lies" was not improper). Here, the statements at issue do not rise to the level of denigrating the defense or the defendant.

For the reasons explained above, we hold that trial counsel did not render ineffective assistance of counsel in failing to object to the arguments and statements made by the prosecution and its witnesses.

### C. Cumulative Error

In his final postconviction claim, Mosley asserts that the cumulative effect of the guilt phase and penalty phase errors renders his convictions and death sentence fundamentally unfair. We reject this claim without further discussion because we have rejected all of the individual guilt phase claims of error both as to ineffective assistance of trial counsel and the claims of relief under Giglio, Brady, and newly discovered evidence, and do not consider Mosley's penalty phase

claims in light of granting relief under <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016).

## II.  Habeas Corpus Petition

In his habeas petition, Mosley raises one additional claim—that although his appellate counsel presented thirteen different issues on direct appeal,[7] counsel was ineffective in failing to assert that the trial court committed a fundamental error when it failed to hold a <u>Faretta</u>[8] hearing after Mosley clearly and unequivocally requested to represent himself pro se.

In order to be entitled to relief, Mosley must show: (1) "appellate counsel's performance was <u>deficient</u> because 'the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance' "; and (2) "the petitioner was prejudiced because appellate counsel's deficiency 'compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.' "  <u>Rutherford v. Moore</u>, 774 So. 2d 637, 643 (Fla. 2000) (quoting <u>Thompson v. State</u>, 759 So. 2d 650, 660 (Fla. 2000)).  Generally, this Court will not find appellate counsel's performance ineffective for failing to raise an issue

---

7.  <u>See</u> <u>supra</u> note 3 (citing <u>Mosley</u>, 46 So. 3d at 518 n.7) (listing Mosley's thirteen direct appeal claims).

8.  <u>Faretta v. California</u>, 422 U.S. 806 (1975).

that would have been found to be procedurally barred if it had been raised on direct appeal or for failing to raise a legal issue that "would in all probability have been found to be without merit" had counsel raised the issue on direct appeal. Id. (quoting Williamson v. Dugger, 651 So. 2d 8, 86 (Fla. 1994)). Moreover, based on the limitations of appellate litigation, this Court has held that "appellate counsel is not necessarily ineffective for failing to raise a claim that might have had some possibility of success; effective appellate counsel need not raise every conceivable nonfrivolous issue." Farina v. State, 937 So. 2d 612, 634 (Fla. 2006) (quoting Valle v. Moore, 837 So. 2d 905, 908 (Fla. 2002)). Instead, counsel will not be considered ineffective simply because he or she limited the appellate arguments to those that were the strongest. Id.

In this case, although Mosley was represented by counsel during the trial proceedings, he often filed pro se filings, including a number of pro se motions that expressed his dissatisfaction with any delays in his case. On December 15, 2004, the trial judge, the Honorable Michael Weatherby, held a hearing on one of Mosley's pro se demands for a speedy trial. The State asserted that Mosley did not have the authority to file such a pleading since he was represented by counsel. At this hearing, the trial court questioned Mosley to ensure that Mosley understood the fact that his attorney was not ready for trial, to which Mosley repeatedly stressed that he was innocent, was unhappy with the fact that he had been in jail for

eight months without a trial, and was ready to go to trial so he could return home to his family. The judge granted the State's motion to strike Mosley's pro se demand. At that point, Mosley stated that he wanted to petition the Court to "go pro se." Based on this statement, however, it was unclear whether Mosley was seeking to represent himself pro se immediately, or if he was merely informing the court that he would be filing a petition for pro se representation in the future. The trial court replied that it would consider Mosley's motion when he filed it and then set the next pretrial hearing.

Shortly after this statement, Mosley filed a pro se Motion for Additional Counsel, requesting the opportunity to participate as cocounsel alongside the attorneys at the Office of the Public Defender. He concluded his motion with, "I am the added counsel requested." New counsel was later appointed, and Mosley never complained about his counsel's performance or mentioned that he wanted to represent himself. Although Mosley filed numerous pro se motions throughout the trial proceedings, he did not file any motion to represent himself and did not orally seek to represent himself pro se.

As this Court has held, "[u]nder the United States Supreme Court's ruling in Faretta, an accused has the right to self-representation at trial. A defendant's choice to invoke this right " 'must be honored out of that respect for the individual which is the lifeblood of the law.' " Tennis v. State, 997 So. 2d 375, 377-78 (Fla.

- 35 -

2008) (quoting <u>Faretta</u>, 422 U.S. at 834).  Before the trial court is mandated to hold a <u>Faretta</u> hearing, "the defendant's request for self-representation must be unequivocal."  <u>Id.</u> at 378; <u>see</u> <u>State v. Craft</u>, 685 So. 2d 1292, 1295 (Fla. 1996) ("[O]nly an unequivocal assertion of the right to self-representation will trigger the need for a <u>Faretta</u> inquiry.").  However, if a defendant unequivocally states that he chooses to represent himself instead of having counsel represent him and the trial court denies the defendant this right, such an error requires reversal.  <u>Pasha v. State</u>, 39 So. 3d 1259, 1262 (Fla. 2010).

When this Court has previously determined that a defendant made an unequivocal statement choosing self-representation instead of being represented by an appointed attorney, the request was made more clearly than Mosley's request in this case.  Further, this Court has previously considered the entire scope of the defendant's request, instead of focusing on one isolated statement.  For example, in <u>Tennis</u>, the defendant informed the trial judge, "I refuse to go to trial with him.  I would like to go pro se instead of having two prosecutors against me, I'll do it myself.  Even though I don't know what I'm doing, I will have a better fighting chance."  997 So. 2d at 378.  The defendant then filed two separate pro se motions requesting self-representation.  This Court concluded that "Tennis's statement at the hearing <u>coupled with his pro se motions</u> was an unequivocal and clear request for self-representation."  <u>Id.</u> (emphasis added).  Likewise, in <u>Pasha</u>, the defendant

- 36 -

stated that while he preferred to have an attorney, so long as it was not his current attorney, his appointed attorney was so ineffective that he would choose to represent himself if the trial judge did not appoint a different attorney. 39 So. 3d at 1262. This Court held that such a statement was a clear, unequivocal request for self-representation, and thus the trial court committed reversible error by not permitting the defendant to represent himself. Id.; see also Raulerson v. Wainwright, 732 F.2d 803, 808-09 (11th Cir. 1984) (holding that the defendant's initial communications, which vacillated between seeking pro se status or being appointed as cocounsel, did not constitute an "unequivocal" assertion of his right to relinquish counsel).

In looking to the full record before us, we conclude that Mosley's brief statement about a future intent to proceed pro se was not an unequivocal request for self-representation. Here, the trial court was in the process of determining whether Mosley could file a pro se demand for speedy trial demand when he was already represented by counsel. Mosley did not mention that he wanted to discharge his counsel. The judge further informed him that he would consider this request, and in an apparent response, Mosley filed a motion requesting to proceed as cocounsel alongside his current counsel. Most importantly, after this filing, Mosley did not request or mention that he sought to represent himself pro se.

Because the request was not an unequivocal request to represent himself pro se, appellate counsel was not deficient in failing to raise such a claim because it would have been found to be without merit.  Therefore, we deny Mosley's petition for habeas corpus relief.

### III.  <u>Hurst v. Florida</u> and <u>Hurst</u>

While Mosley's postconviction case and habeas petition were pending in this Court, the United States Supreme Court issued its opinion in <u>Hurst v. Florida</u>.[9] In <u>Hurst v. Florida</u>, the United States Supreme Court declared our capital sentencing scheme, codified at section 921.141(3)(a)-(b), Florida Statutes (2015), unconstitutional because the "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death.  A jury's mere recommendation is not enough."  136 S. Ct. at 619.

Pursuant to the Supreme Court's decision in <u>Hurst v. Florida</u>, Mosley filed a motion requesting leave to file supplemental briefing to address the impact of <u>Hurst v. Florida</u> on his case.  We granted the motion, and Mosley now contends that he is entitled to relief under <u>Hurst v. Florida</u> and, thus, his sentence of death must be vacated because of the jury's nonunanimous death recommendation.

---

9.  <u>Hurst v. Florida</u> (<u>Hurst v. Florida</u>), 136 S. Ct. 616 (2016).

- 38 -

In Hurst v. Florida, the United States Supreme Court specifically relied, not on new jurisprudential developments in Sixth Amendment case law, but rather, on its 2002 opinion in Ring v. Arizona, 536 U.S. 584 (2002). The Supreme Court determined that "[t]he analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's" death penalty:

> Like Arizona at the time of Ring, Florida does not require the jury to make the critical findings necessary to impose the death penalty. Rather, Florida requires a judge to find these facts. Fla. Stat. § 921.141(3) [2015]. Although Florida incorporates an advisory jury verdict that Arizona lacked, we have previously made clear that this distinction is immaterial: "It is true that in Florida the jury recommends a sentence, but it does not make specific factual findings with regard to the existence of mitigating or aggravating circumstances and its recommendation is not binding on the trial judge. A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona." Walton v. Arizona, 497 U.S. 639, 648, 110 S. Ct. 3047 (1990); accord State v. Steele, 921 So. 2d 538, 546 (Fla. 2005) ("[T]he trial court alone must make detailed findings about the existence and weight of aggravating circumstances; it has no jury findings on which to rely").
>     As with Timothy Ring, the maximum punishment Timothy Hurst could have received without any judge-made findings was life in prison without parole. As with Ring, a judge increased Hurst's authorized punishment based on her own factfinding. In light of Ring, we hold that Hurst's sentence violates the Sixth Amendment.

Hurst v. Florida, 136 S. Ct. at 621-22 (emphasis supplied). Thus, in holding our statute unconstitutional, the United States Supreme Court applied the exact reasoning of Ring to Florida's death penalty sentencing scheme. Id.

On remand from the United States Supreme Court, in <u>Hurst</u>,[10] this Court interpreted the United States Supreme Court's holding in <u>Hurst v. Florida</u> and held "that the Supreme Court's decision in <u>Hurst v. Florida</u> requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury. We reach this holding based on the mandate of <u>Hurst v. Florida</u> and on Florida's constitutional right to jury trial, considered in conjunction with our precedent concerning the requirement of jury unanimity as to the elements of a criminal offense." <u>Hurst</u>, 202 So. 3d at 44. Reviewing Florida's capital sentencing scheme, the Court concluded that "these specific findings required to be made by the jury include the existence of each aggravating factor that has been proven beyond a reasonable doubt, the finding that the aggravating factors are sufficient, and the finding that the aggravating factors outweigh the mitigating circumstances." <u>Id.</u> Further, we held, based on Florida's independent constitutional right to trial by jury that, in order for the trial court to impose a sentence of death, the jury's recommendation for a sentence of death must be unanimous. <u>Id.</u>

Further, we have now held in <u>Asay v. State</u>, that <u>Hurst</u> does not apply retroactively to capital defendants whose sentences were final before the United

_____

10. <u>Hurst</u>, 202 So. 3d 40 (Fla. 2016).

- 40 -

States Supreme Court issued its opinion in <u>Ring</u>. <u>See</u> <u>Asay v. State</u>, Nos. SC16-223, SC16-102, SC16-628 (slip op. issued Fla. Dec. 22, 2016), at 35. However, our opinion in <u>Asay</u> left open the question of whether <u>Hurst</u> applies retroactively to postconviction defendants, like Mosley, whose sentences of death became final after the United States Supreme Court decided <u>Ring</u>. <u>Id.</u>

We now turn to the issue of whether <u>Hurst</u> should apply retroactively to Mosley. We approach our retroactivity analysis based on the United States Supreme Court's holding in <u>Hurst v. Florida</u> under the United States Constitution's Sixth Amendment right to trial by jury and our opinion in <u>Hurst</u>, interpreting the meaning of <u>Hurst v. Florida</u> as applied to Florida's capital sentencing scheme and considering Florida's independent right to trial by jury in article I, section 22, of the Florida Constitution. We first review our precedent holding that certain decisions should be given retroactive effect on the basis of fundamental fairness, such as <u>James v. State</u>, 615 So. 2d 668 (Fla. 1993). We then review the factors in the <u>Witt v. State</u>, 387 So. 2d 922 (1980), retroactivity framework, explaining the unique jurisprudential conundrum caused by the United States Supreme Court's delay in reviewing the constitutionality of Florida's capital sentencing scheme in light of <u>Ring</u>. After reviewing these considerations, we conclude that <u>Hurst</u> should apply retroactively to Mosley.

## A.  Fundamental Fairness: James v. State

Mosley, whose crimes occurred in April 2004, raised his entitlement to the application of Ring at his first opportunity at the trial level, arguing the unconstitutionality of Florida's death penalty in light of Ring and that he was entitled to a unanimous jury verdict.[11]  Mosley's Ring claims were consistently rejected by the trial court judge.  He then raised a Ring claim on direct appeal, which this Court summarily rejected by stating that his remaining claims, including a Ring claim, "are clearly without merit based on this Court's precedent . . . and do not require further elaboration."  Mosley, 46 So. 3d at 518; accord id. at 518 n.7.  Mosley also filed a petition for certiorari to the United States Supreme Court, which was denied.  Mosley v. Florida, 526 U.S. 887 (2010).  Since the time this Court denied Mosley's Sixth Amendment claim under Ring, a major development occurred in 2016, when the United States Supreme Court finally held in Hurst v.

_____

11.  In fact, Mosley's Ring-related filings were extensive. See, e.g., State v. Mosley, No. 16-2004-CF-6675-AXXX-MA, 2005 WL 6353490 (Fla. Cir. Ct. 4th Cir. Nov. 29, 2005) (denying Defendant's Motion to Declare Florida's Death Penalty Unconstitutional); id., 2005 WL 8132035 (Fla. Cir. Ct. 4th Cir. Aug. 25, 2005) (denying Defendant's Motion in Limine and to Strike Portions of "Florida Standard Jury Instructions in Criminal Cases" Re: Caldwell v. Mississippi); id., 2005 WL 8132030 (Fla. Cir. Ct. 4th Cir. Aug. 25, 2005) (denying Defendant's Motion to Prohibit Misleading References to the Advisory Role of the Jury at Sentencing).

Florida that the "analysis the Ring Court applied to Arizona's sentencing scheme applies equally to Florida's." 136 S. Ct. at 621-22.

This Court has previously held that fundamental fairness alone may require the retroactive application of certain decisions involving the death penalty after the United States Supreme Court decides a case that changes our jurisprudence. For example, in James, this Court reviewed whether the United States Supreme Court's decision in Espinosa v. Florida, 505 U.S. 1079 (1992), should apply retroactively. James, 615 So. 2d at 669. Although pre-Espinosa this Court had rejected claims that our jury instruction on the extremely heinous, atrocious or cruel (HAC) aggravator was unconstitutionally vague, the United States Supreme Court disagreed and held in Espinosa that our instruction was, indeed, unconstitutionally vague. 505 U.S. 1079. This Court then held that defendants who had raised a claim at trial or on direct appeal that the jury instruction pertaining to the HAC aggravating factor was unconstitutionally vague were entitled to retroactive application of Espinosa. James, 615 So. 2d at 669. While this Court did not employ a standard retroactivity analysis in James, the basis for granting relief was that of fundamental fairness. Id. This Court reasoned that, because James had raised the exact claim that was validated by the United States Supreme Court in Espinosa, "it would not be fair to deprive him of the Espinosa ruling." Id.

- 43 -

The situation presented by the United States Supreme Court's holding in

Hurst v. Florida is not only analogous to the situation presented in James, but also

concerns a decision of greater fundamental importance than was at issue in James.

Id.[12]  For fourteen years after Ring, until the United States Supreme Court decided

Hurst v. Florida, Florida's capital defendants attempted to seek relief based on

Ring, both in this Court and the United States Supreme Court.  In this instance, as

in James, where Mosley repeatedly raised Ring claims that were rejected, the

interests of finality must yield to fundamental fairness.  See Witt, 387 So. 2d at

925.  Under Hurst v. Florida and Hurst, the fundamental right to trial by jury under

both the United States and Florida Constitutions is implicated, and Florida's death

---

12.  This result is further supported by this Court's precedent, similar to James, holding that other new rules, which had far less impact on the sanctity of a jury's verdict than the rule from Hurst v. Florida, should apply retroactively.  See, e.g, Thompson v. Dugger, 515 So. 2d 173, 175 (Fla. 1987) (holding retroactive Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987), which held that instruction to advisory jury to not consider nonstatutory mitigation, and trial judge's refusal to consider nonstatutory mitigation was improper); Harvard v. State, 486 So. 2d 537, 539 (Fla. 1986) (holding retroactive the United States Supreme Court's decision in Lockett v. Ohio, 438 U.S. 586, 608 (1978), which held that the exclusion of nonstatutory mitigating evidence was unconstitutional); State v. White, 470 So. 2d 1377, 1379 (Fla. 1985) (holding retroactive Enmund v. Florida, 458 U.S. 782, 797 (1982), which held that the "imposition of the death penalty on one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed," is improper); Tafero v. State, 459 So. 2d 1034, 1035 (Fla. 1984) (determining, under Witt, that Enmund is "such a change in the law as to be cognizable in post-conviction proceedings").

penalty sentencing procedure has been held unconstitutional, thereby making "the machinery of post-conviction relief . . . necessary to avoid individual instances of obvious injustice." Id. at 925.

Accordingly, because Mosley raised a Ring claim at his first opportunity and was then rejected at every turn, we conclude that fundamental fairness requires the retroactive application of Hurst, which defined the effect of Hurst v. Florida, to Mosley.

## B. Retroactivity of Hurst v. Florida and Hurst Under a Witt Analysis

We now turn to a retroactivity analysis under Florida's standard from Witt, which involves a more in-depth consideration of how to analyze when fairness must yield to finality based on changes in the law. We conclude that under a standard Witt analysis, Hurst should be applied to Mosley and other defendants whose sentences became final after the United States Supreme Court issued its opinion in Ring.[13]

---

13. The difference between a retroactivity approach under James and a retroactivity approach under a standard Witt analysis is that under James, a defendant or his lawyer would have had to timely raise the constitutional argument, in this case a Sixth Amendment argument, before this Court would grant relief. However, using a Witt analysis, any defendant who falls within the ambit of the retroactivity period would be entitled to relief regardless of whether the defendant or his or her lawyer had raised the Sixth Amendment argument. In this case, we determine that Mosley would be entitled to retroactive application of Hurst under either approach.

- 45 -

Under Witt, a change in the law does not apply retroactively "unless the change: (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance." Witt, 387 So. 2d at 931. Determining the retroactivity of a holding "requir[es] that [this Court] resolve a conflict between two important goals of the criminal justice system—ensuring finality of decisions on the one hand, and ensuring fairness and uniformity in individual cases on the other—within the context of post-conviction relief from a sentence of death." Id. at 924-25. Put simply, balancing fairness versus finality is the essence of a Witt retroactivity analysis. See id. at 925.

First, we address this Court's opinion in Johnson v. State, 904 So. 2d 400, 409 (Fla. 2005), which held that Ring did not apply retroactively. As we stated in our opinion in Asay:

> [O]ur retroactivity analysis in Johnson hinged upon our understanding of Ring's application to Florida at that time. Thus, we did not treat the aggravators as elements of the crime that needed to be found by a jury to the same extent as other elements of the crime. Specifically, because we were still bound by Hildwin[v. Florida, 490 U.S. 638 (1989)], we did not properly analyze the purpose of the new rule in Ring, which was to protect the fundamental right to a jury in determining each element of an offense. With the issuance of Hurst v. Florida, in which the United States Supreme Court overruled its decision in Hildwin, we conclude that this Court must now reconsider its prior decision in Johnson.

Slip op. at 22.

- 46 -

We now turn to a Witt retroactivity analysis in this case. It is undisputed that Hurst v. Florida satisfies the first two prongs of the Witt analysis because it emanates from the United States Supreme Court and is constitutional in nature. Likewise, our recent decision in Hurst is undoubtedly a decision of fundamental constitutional significance because it emanates from this Court and is based on Florida's independent constitutional right to trial by jury under article I, section 22, of the Florida Constitution. However, the third prong of the Witt test turns entirely on whether the new rule, here Hurst v. Florida, is a "development of fundamental significance." Witt, 387 So. 2d at 931. To be a "development of fundamental significance," the change in law must "place beyond the authority of the state the power to regulate certain conduct or impose certain penalties," or alternatively, be "of sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test of Stovall and Linkletter." Id. at 929. We conclude that Hurst v. Florida, as interpreted by this Court in Hurst, falls within the category of cases that are of "sufficient magnitude to necessitate retroactive application as ascertained by the three-fold test" from Stovall[14] and Linkletter,[15] which we address below. Id.

---

14. Stovall v. Denno, 388 U.S. 293 (1967).

15. Linkletter v. Walker, 381 U.S. 618 (1965).

- 47 -

The three-fold test of <u>Stovall</u> and <u>Linkletter</u> requires courts to analyze three factors: (a) the purpose to be served by the rule, (b) the extent of reliance on the prior rule, and (c) the effect that retroactive application of the new rule would have on the administration of justice. <u>Witt</u>, 387 So. 2d at 926; <u>Johnson</u>, 904 So. 2d at 408. Importantly, the purpose of the three-part test is to determine where finality yields to fairness based on a change in the law. There can, therefore, be no precise mathematical formula, and the prongs should not and cannot be mechanically applied. In fact, as this Court explained in adopting <u>Witt</u>, "Unfortunately, drawing or defining the line where finality gives way to fairness based on a change of law is no simple task." <u>Witt</u>, 387 So. 2d at 934. Likewise, no prong is necessarily the most significant factor. Instead, the prongs are intertwined and analyzed as part of a holistic review. Determining when finality of the judgment must yield to fundamental fairness is especially critical when addressing laws that govern the imposition of the ultimate penalty—death.

### 1. Purpose of the New Rule

The first factor under the <u>Stovall</u>/<u>Linkletter</u> test is the purpose to be served by the new rule. <u>Witt</u>, 387 So. 2d at 926. The purpose of the new rule announced in <u>Hurst</u> is to ensure that capital defendants' foundational right to a trial by jury— the only right protected in both the body of the United States Constitution and the Bill of Rights and then, independently, in the Florida Constitution—under article I,

section 22, of the Florida Constitution and the Sixth Amendment to the United States Constitution—is preserved within Florida's capital sentencing scheme. See Hurst, 202 So. 3d at 57.

The United States Supreme Court stated succinctly in Hurst v. Florida that "[t]he Sixth Amendment protects a defendant's right to an impartial jury." 136 S. Ct. at 624. Expounding on the importance of this constitutional right in Hurst, we explained:

> [T]he Supreme Court has made clear that individualized sentencing is required in which the discretion of the jury and the judge in imposing the death penalty will be narrowly channeled, and in which the circumstances of the offense, the character and record of the defendant, and any evidence of mitigation that may provide a basis for a sentence less than death must be a part of the sentencing decision.
> . . . .
> The Supreme Court in Hurst [v. Florida] has now [also] made clear that the critical findings necessary for imposition of a sentence of death are the sole province of the jury. And because these findings occupy a position on par with elements of a greater offense, we conclude that all these findings necessary for the imposition of a sentence of death must be made by the jury—as are all elements— unanimously.

Hurst, 202 So. 3d at 57 (footnotes omitted).

Separate from the Federal Constitution, we explained in Hurst that "this Court, in interpreting the Florida Constitution and the rights afforded to persons within this State, may require more protection be afforded criminal defendants than that mandated by the federal Constitution." Id. Finding that such heightened protection was significantly appropriate in this context, we stated: "This is

- 49 -

especially true, we believe, in cases where, as here, Florida has a longstanding history requiring unanimous jury verdicts as to the elements of a crime." Id. Under Florida's independent constitutional right to a trial by jury, this Court concluded: "If death is to be imposed, unanimous jury sentencing recommendations, when made in conjunction with the other critical findings unanimously found by the jury, provide the highest degree of reliability in meeting these constitutional requirements in the capital sentencing process." Id. at 60.

Thus, because Hurst v. Florida held our capital sentencing statute unconstitutional under the Sixth Amendment to the United States Constitution, and Hurst further emphasized the critical importance of a unanimous verdict within Florida's independent constitutional right to trial by jury under article I, section 22, of the Florida Constitution, the purpose of these holdings weighs heavily in favor of retroactive application.

### 2. Reliance on the Old Rule

The next factor under the Stovall/Linkletter test is the extent of reliance on the old rule—specifically, in this case, that the rights announced in Ring did not apply to Florida's death penalty sentencing statute. Witt, 387 So. 2d at 926. In Furman v. Georgia, 408 U.S. 238 (1972), the United States Supreme Court, with nine separate opinions, found the "imposition and carrying out of the death penalty" in certain states to be unconstitutional based on the Eighth and Fourteenth

- 50 -

Amendments' requirement that the death penalty may not be imposed without adequate guidelines to ensure that defendants are not arbitrarily sentenced to death. Id. at 239. At the time of Furman, with the agreement of the State, all imposed death sentences in Florida were reduced to life. Donaldson v. Sack, 265 So. 2d 499, 505 (Fla. 1972).

Shortly thereafter, Florida revised its death penalty statute, the first in the nation to set forth aggravating factors that would render a defendant eligible for the death penalty. See Hurst, 202 So. 3d at 56. Upon review in State v. Dixon, 283 So. 2d 1, 11 (Fla. 1973), a majority of this Court concluded that the new statute was in conformance with the constitutional requirements of Furman. 283 So. 2d 1, 11 (Fla. 1973). Also in Dixon, this Court concluded that Furman did not render the actual death penalty unconstitutional and that the Florida Legislature, through the new statute, had appropriately "chosen to reserve [the] application [of death] to only the most aggravated and unmitigated of most serious crimes." Id. at 7.

The United States Supreme Court subsequently, in a series of three cases, held that Florida's post-Furman death penalty statute—where the trial judge played the critical, but not sole, role in determining the facts necessary to impose the death

penalty—did not violate the United States Constitution.[16]  Therefore, from the time of the Legislature's revision of the death penalty in 1972 until Ring in 2002—a period of three decades—this Court and the State of Florida relied in good faith upon United States Supreme Court precedent for the proposition that Florida's capital sentencing scheme was constitutional.[17]

It was not until Ring that the United States Supreme Court applied its reasoning from Apprendi v. New Jersey, 530 U.S. 466 (2000), holding that a jury must find every fact necessary to increase the maximum punishment, to capital sentencing.  Ring, 536 U.S. at 589.  In the words of Justice Scalia, Ring brought about "new wisdom":[18]

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death.

Id. at 609.

---

16.  See Walton v. Arizona, 497 U.S. 639, 648 (1990) (reaffirming the validity of Florida's death penalty); Hildwin v. Florida, 490 U.S. 638, 640-41 (1989); Spaziano v. Florida, 468 U.S. 447, 449 (1984).

17.  Further, while the reasoning in Apprendi v. New Jersey, 530 U.S. 466, 496 (2000), appeared to challenge the prior reasoning of Walton and similar cases, the Supreme Court expressly excluded death penalty cases from its holding in Apprendi.  See id. at 497.

18.  Ring, 536 U.S. at 611 (Scalia, J., concurring).

Ring specifically overruled Walton v. Arizona, 497 U.S. 639 (1990), but failed to address the constitutionality of Florida's capital sentencing scheme by not discussing Hildwin or Spaziano, thereby leaving those decisions intact to support an argument that Florida's capital sentencing scheme remained valid. Ring, 536 U.S. at 603. Thus, this Court continued to rely in good faith on precedent supporting the validity of Florida's capital sentencing scheme, despite doubt about its constitutionality.[19] The plurality in Bottoson v. Moore concluded that it was

---

19. The several individual decisions in Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), reflect this doubt following Ring. Chief Justice Anstead explained the history of unanimity in jury verdicts in Florida and his concerns about the continued constitutionality of Florida's statute:

> Florida has long required unanimous verdicts in all criminal cases including capital cases. Florida Rule of Criminal Procedure 3.440 states that no jury verdict may be rendered unless all jurors agree. Furthermore, in Jones v. State, 92 So. 2d 261 (Fla. 1956), this Court held that any interference with the right to a unanimous verdict denies the defendant a fair trial. However, in Florida, the jury's advisory recommendation in a capital case is not statutorily required to be by unanimous vote. The jury's advisory recommendation may be by mere majority vote. This would appear to constitute another visible constitutional flaw in Florida's scheme when the Sixth Amendment right to a jury trial is applied as it was in Apprendi and Ring.

Bottoson, 833 So. 2d at 710 (Anstead, C.J., concurring in result only).

Justice Shaw also found that jury unanimity was required:

> It is settled in Florida that the State in a criminal prosecution has the burden of proving each element of the charged offense beyond a reasonable doubt. Before jurors can return a guilty verdict, they must unanimously agree that each element of the charged offense has

- 53 -

been established beyond a reasonable doubt. This requirement of unanimity has been an inviolate tenet of Florida jurisprudence since the State was created.

Id. at 714 (Shaw, J., concurring in result only) (footnotes omitted).

Justice Pariente expressed doubt of the continued validity of Florida's capital sentencing scheme after Ring, warning that the Court "must confront the fact that the implications of Ring are inescapable." Id. at 723 (Pariente, J., concurring in result only). She explained:

> Just like the Arizona sentencing scheme at issue in Ring, Florida's sentencing scheme requires additional findings by the judge before the death penalty can be imposed. . . .
> The additional jury findings of aggravators before imposition of death are mandated not only by the plain language of the capital sentencing statute, but also by the Eighth Amendment to the United States Constitution as interpreted in Furman, and its progeny. Indeed, as recognized by Justice Scalia in his concurring opinion in Ring, "the only reason the fact [the aggravating factor] is essential is that [the United States Supreme] Court has . . . said that the Constitution requires state law to impose such 'aggravating factors.'" 536 U.S. at —— . . . (Scalia, J., concurring). Thus, while the Eighth Amendment requires the findings of aggravating factors in an effort to ensure against the death penalty being imposed arbitrarily, the Sixth Amendment as interpreted by Ring requires that those aggravating factors be found by a jury. As Justice Scalia explained in Ring, the bottom line is that "the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives— whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by a jury." Id. (emphasis supplied).

Id. at 721-22.

Justice Lewis explained:

within the purview of the United States Supreme Court to overrule <u>Hildwin</u> and

<u>Spaziano</u> to the extent they upheld Florida's death penalty statute from Sixth

Amendment attacks.[20]   Nevertheless, the Florida Legislature did not revise our

capital sentencing statute until 2016, after the United States Supreme Court

decided <u>Hurst v. Florida</u>.  While inaction was clearly within the Legislature's

prerogative, it is now for this Court to determine whether to deny relief to those

defendants who were sentenced to death under an invalid statute based solely on

the United States Supreme Court's delay in overruling <u>Hildwin</u> and <u>Spaziano</u>.

Because Florida's capital sentencing statute has essentially been

unconstitutional since <u>Ring</u> in 2002, fairness strongly favors applying <u>Hurst</u>,

---

> Thus, our high Court's conclusions in <u>Ring</u> should be viewed through
> a prism which casts its primary focus upon the actual procedures
> mandated by the decision.  Essentially, this Court cannot focus upon
> what the U.S. Supreme Court did not say, but must center upon the
> practical effects of the <u>Ring</u> Court's actual determination.  In my
> view, the absence of a discussion in <u>Ring</u> of Florida's procedures
> cannot be relied on as solid evidence that the decision has virtually no
> effect in Florida, a conclusion with which I cannot concur.

<u>Id.</u> at 727 (Lewis, J., concurring in result only).

20. <u>See id.</u> at 695 ("[T]he United States Supreme Court repeatedly has
reviewed and upheld Florida's capital sentencing statute over the past quarter of a
century, and although Bottoson contends that there now are areas of 'irreconcilable
conflict' in that precedent, the Court in <u>Ring</u> did not address this issue.") (plurality
opinion) (footnotes omitted).

retroactively to that time. The "extent of reliance" prong is not a question of whether this Court properly or in good faith relied on United States Supreme Court precedent, but how the precedent changed the calculus of the constitutionality of Florida's death penalty scheme. In Hurst, we explained how the Hurst v. Florida opinion focused on the intricacies of Florida's prior, invalid statute before determining that Ring applied equally in Florida and Arizona:

> Before reaching its conclusion . . . that Florida's capital sentencing scheme violated th[e] guarantee of the right to a jury trial on all elements of the crime of capital murder, the Supreme Court evaluated Florida's existing capital sentencing scheme by first noting that, pursuant to section 775.082(1), Florida Statutes (2012), the maximum sentence a capital felon may receive on the basis of the conviction alone is life imprisonment. [Hurst v. Florida, 136 S. Ct.] at 620. . . . The Supreme Court analyzed Florida's scheme as one in which a jury renders only an advisory verdict without specifying the factual basis of its recommendation, while the judge evaluates the evidence of aggravation and mitigation and makes the ultimate sentencing determinations. Id. at 620. . . .
> . . . The Supreme Court also distinguished Arizona law and explained that Florida law, similar to the law invalidated in Ring, did not require the jury to make the critical findings necessary to impose death, but required the judge to make these findings—rejecting as significant the distinction that Florida provides for a jury recommendation as to sentence, whereas Arizona law does not. Id. at 622. "A Florida trial court no more has the assistance of a jury's findings of fact with respect to sentencing issues than does a trial judge in Arizona." Id. (quoting Walton, 497 U.S. at 648). The Court explained that in Florida, the trial judge has no jury findings on which to rely. Id. (citing Steele, 921 So. 2d at 546).

Hurst, 202 So. 3d at 51.

We now know after <u>Hurst v. Florida</u> that Florida's capital sentencing statute was unconstitutional from the time that the United States Supreme Court decided <u>Ring</u>.[21] From <u>Hurst</u>, it is undeniable that <u>Hurst v. Florida</u> changed the calculus of the constitutionality of capital sentencing in this State. Thus, this factor weighs in favor of granting retroactive relief to the point of the issuance of <u>Ring</u>.

### 3. Effect on the Administration of Justice

The last factor of the <u>Stovall</u>/<u>Linkletter</u> test requires this Court to determine the effect that retroactive application would have on the administration of justice. As the Court stated in <u>Ferguson v. State</u>, like the other prongs, "[t]his [prong] requires a balancing of the justice system's goals of fairness and finality." 789 So. 2d 306, 312 (Fla. 2001). In this analysis, the Court reviews whether retroactive application would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." <u>Witt</u>, 387 So. 2d at 929-30.

Holding <u>Hurst</u> retroactive to when the United States Supreme Court decided <u>Ring</u> would not destroy the stability of the law, nor would it render punishments uncertain and ineffectual. As we determined in <u>Hurst</u>, the death penalty is still a constitutional punishment, and no defendant will receive a new guilt phase or be

---

21. <u>Hurst v. Florida</u>, 136 S. Ct. at 621-22 ("The analysis [of] the <u>Ring</u> Court . . . applies equally to Florida's [sentencing scheme].").

released from prison while a new penalty phase takes place. 202 So. 3d at 65

("After Hurst v. Florida, the death penalty still remains the ultimate punishment in

Florida, although the Supreme Court has now required that all the critical findings

necessary for imposition of the death penalty be transferred to the jury.").

Of course, any decision to give retroactive effect to a newly announced rule

of law will have some impact on the administration of justice. That is not the

inquiry. Rather, the inquiry is whether holding a decision retroactive would have

the effect of burdening "the judicial machinery of our state, fiscally and

intellectually, beyond any tolerable limit." Witt, 387 So. 2d at 929-30. By

embracing this principle as an analytical lynchpin, together with the other two

prongs of the three-part test, the Court was attempting to distinguish between

"jurisprudential upheavals" and "evolutionary refinements,"[22] the former being

those that justify retroactive application and the latter being those that do not.[23]

Thus, we must decide whether interests of fundamental fairness justify the

impact on the administration of justice that would result from holding Hurst

---

22. State v. Barnum, 921 So. 2d 513, 526 (Fla. 2005); Bunkley v. State, 833 So. 2d 739, 745 (Fla. 2002).

23. See e.g., Barnum, 921 So. 2d at 526 (denying retroactive application of Thompson v. State, 695 So. 2d 691 (Fla. 1997), because it was "a conventional, nonconstitutional concept"); Glenn v. State, 558 So. 2d 4, 8 (Fla. 1990) (denying retroactive relief of Carawan v. State, 515 So. 2d 161, 171 (Fla. 1987), because applying it retroactively would not "cure any individual injustice or unfairness").

retroactive. As we have stated, capital punishment "connotes special concern for individual fairness because of the possible imposition of a penalty as unredeeming as death." Witt, 387 So. 2d at 926. In this case, where the rule announced is of such fundamental importance, the interests of fairness and "cur[ing] individual injustice" compel retroactive application of Hurst despite the impact it will have on the administration of justice. State v. Glenn, 558 So. 2d 4, 8 (Fla. 1990).

We contrast our decision to hold Hurst retroactive with our decision in Chandler v. Crosby, 916 So. 2d 728 (2005), not to hold the United States Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), retroactive. In the Witt analysis in Chandler, as to the impact on the administration of justice, we explained:

> [I]f Crawford applied retroactively, the administration of justice would be greatly affected. Retroactive application could require courts to "overturn convictions" and "delve into stale records to" determine whether defendants had a chance to cross-examine unavailable witnesses. Callaway, 658 So. 2d at 987. When new trials were determined necessary to correct errors under Crawford, the justice system would then have to deal with a multitude of problems, including lost evidence and unavailable witnesses. See Windom, 886 So. 2d at 952 (Cantero, J., concurring) (noting similar problems would arise should Ring apply retroactively). Such retroactive application would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." Witt, 387 So. 2d at 929-30.

Chandler, 916 So. 2d at 730-31.

Chandler was not limited to death penalty cases but, instead, would have affected all criminal cases. This effect could have had a major impact on the administration of justice and the finality of all criminal convictions. Thus, it is clear, in that situation, fairness did not compel us to disturb the finality of fully adjudicated cases. See Witt, 38 So. 2d at 924-25.

By contrast, holding Hurst retroactive would only affect the sentences of capital defendants. Further, in addition to the fact that convictions will not be disturbed, not every defendant to whom Hurst applies will ultimately receive relief. As we determined in Hurst, each error should be reviewed under a harmless error analysis to individually determine whether each defendant will receive a new penalty phase. Hurst, 202 So. 3d at 67-68; James, 615 So. 2d at 669. Additionally, we have declined to find Hurst applicable to those cases where the defendant waived his/her right to trial by jury. See Mullens v. State, 197 So. 3d 16 (Fla.), pet. for cert. filed, No. 16-6773 (Nov. 4, 2016).

Finally, we again emphasize that this decision will only impact the sentence of death, not the conviction. The difference is not guilt or innocence but, instead, life or death.

### 4. Conclusion of Retroactivity Analysis

After weighing all of the considerations essential to a faithful Witt analysis, we conclude that Hurst should be applied retroactively to Mosley. The purpose of

- 60 -

the holdings in <u>Hurst v. Florida</u> and <u>Hurst</u> is to prevent a violation of the fundamental and critically important right to a trial by jury. <u>See</u> <u>Hurst</u>, 202 So. 3d at 50-51, 55.

Applying <u>Hurst</u> retroactively to Mosley, in light of the rights guaranteed by the United States and Florida Constitutions, supports basic tenets of fundamental fairness. And it is fundamental fairness that underlies the reasons for retroactivity of certain constitutionally important decisions, especially those involving the death penalty. Indeed, as we stated in <u>Witt</u>:

> [S]ociety recognizes that a sweeping change of law can so drastically alter the substantive or procedural underpinnings of a final conviction and sentence that the machinery of post-conviction relief is necessary to avoid individual instances of obvious injustice. <u>Considerations of fairness and uniformity make it very "difficult to justify depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases."</u>

387 So. 2d at 925 (citations omitted) (emphasis added).

Defendants who were sentenced to death under Florida's former, unconstitutional capital sentencing scheme after <u>Ring</u> should not suffer due to the United States Supreme Court's fourteen-year delay in applying <u>Ring</u> to Florida. In other words, defendants who were sentenced to death based on a statute that was actually rendered unconstitutional by <u>Ring</u> should not be penalized for the United States Supreme Court's delay in explicitly making this determination. Considerations of fairness and uniformity make it very "difficult to justify

- 61 -

depriving a person of his liberty or his life, under process no longer considered acceptable and no longer applied to indistinguishable cases." Witt, 387 So. 2d at 925. Thus, Mosley, whose sentence was final in 2009, falls into the category of defendants who should receive the benefit of Hurst.

### C. Harmless Error

Having concluded that Hurst applies retroactively to Mosley, this Court must next examine whether any Hurst error was harmless beyond a reasonable doubt. On remand from the United States Supreme Court, in Hurst, we explained the appropriate standard for harmless error review:

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.] DiGuilio, 491 So. 2d [1129,] 1137 [Fla. 1986], and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> > The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Hurst, 202 So. 3d at 68 (alteration in original). As applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found all facts necessary to impose death and that death was the appropriate sentence.

Following Mosley's penalty phase, the jury recommended a life sentence for the murder of Lynda Wilkes, and by a vote of eight to four, recommended a sentence of death for the murder of Jay-Quan Mosley. The court held a Spencer hearing and, after independently weighing the aggravating factors and mitigating circumstances, agreed with the jury's recommendation. In imposing the death sentence for the murder of Jay-Quan, the trial court found four aggravators applied, each of which was given great weight: (1) the victim of the capital felony was under twelve years of age; (2) the murder was cold, calculated, and premeditated (CCP); (3) the murder was committed for pecuniary gain; and (4) the defendant had been previously convicted of a capital felony (the contemporaneous murder of Wilkes). Mosley, 46 So. 3d at 517 n.6. The trial court determined twenty-nine nonstatutory mitigating factors[24] applied, but found that they were outweighed by

---

24. Supra note 2 (listing the twenty-nine mitigators).

the significant aggravation and, thus, sentenced Mosley to death for the murder of his son.

In light of the disparate jury recommendations of life for the murder of Wilkes and the eight-to-four recommendation of death for the murder of Jay-Quan and the twenty-nine mitigating circumstances, the State has failed to show beyond a reasonable doubt that the Hurst error was harmless. The trial court even recognized as much, stating in the sentencing order:

> [I]f there were ever a case which supports the proposition that Florida juries be asked to specify which aggravating factors they find from the evidence, this is the one. Had that been required as a matter of law, this Court would have had a much better understanding of the manner in which the jury reached its diverse recommendations.

Without written findings, any attempt to discern what mitigation the four jurors who recommended against death relied on, what aggravating factors, if any, were found unanimously to be sufficient to impose a sentence of death, and why the jury gave such disparate recommendations in this case would be mere speculation. Thus, we cannot conclude that the Hurst error in Mosley's sentencing was harmless beyond a reasonable doubt.

## CONCLUSION

Based on the foregoing, we affirm the postconviction court's denial of relief, and we also deny the claims in Mosley's petition for a writ of habeas corpus with

- 64 -

the exception of his claim for relief under Hurst v. Florida. Accordingly, we

vacate the death sentence and remand this case for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY, J., concurs in part and dissents in part with an opinion, in which
POLSTON, J., concurs.
PERRY, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.


CANADY, J., concurring in part and dissenting in part.

I agree with the decision to affirm the denial of relief on Mosley's guilt

phase claims. But I strongly disagree with the decision to vacate Mosley's death

sentence and to remand for a new penalty phase. Based on the jury's verdict

establishing the existence of an aggravator, I would conclude that there was no

Hurst v. Florida, 136 S. Ct. 616 (2016), violation. I would also conclude that in

any event Hurst v. Florida should not be given retroactive application under the

analysis required by Witt v. State, 387 So. 2d 922 (1980). The denial of retroactive

application ineluctably follows from this Court's decision in Johnson v. State, 904

So. 2d 400, 412 (Fla. 2005), "hold[ing] that Ring[ v. Arizona, 536 U.S. 584

(2002),] does not apply retroactively in Florida." I would also reject Mosley's

other penalty phase claims.  The postconviction court's denial of all relief should be affirmed.

## I.

I adhere to my view that <u>Hurst v. Florida</u>—like <u>Ring</u>—only requires that the jury find the existence of an aggravator that renders a defendant eligible to be considered for death.  <u>See</u> <u>Hurst v. State</u>, 202 So. 3d 40 (Fla. 2016) (Canady, J., dissenting).  The majority recognizes that its decision regarding retroactivity involves "determin[ing] whether to deny relief to those defendants who were sentenced to death under an invalid statute based solely on the United States Supreme Court's delay in overruling <u>Hildwin</u>[ v. Florida, 490 U.S. 638 (1989) (per curiam),] and <u>Spaziano</u>[ v. Florida, 468 U.S. 447 (1984)]."  Majority op. at 55.  But the majority continues to ignore the limit articulated by the Supreme Court on its overruling of <u>Hildwin</u> and <u>Spaziano</u>.  <u>Hurst v. Florida</u>'s overruling of <u>Spaziano</u> and <u>Hildwin</u> expressly identifies the absence of a jury finding of an aggravator as the constitutional flaw in Florida's death penalty statute: "The decisions are overruled to the extent they allow a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty." <u>Hurst v. Florida</u>, 136 S. Ct. at 624.  The majority provides no explanation of how the expansive holding of <u>Hurst v. State</u> can be reconciled with the narrow focus of <u>Hurst v. Florida</u>.  The majority fails to offer such an

explanation because no such explanation is possible.  The majority's "opinion in Hurst[ v. State], interpreting the meaning of Hurst v. Florida as applied to Florida's capital sentencing scheme," majority op. at 41, thus offers an "interpretation" that resolutely ignores the core holding of Hurst v. Florida.

## II.

In its analysis of retroactivity, the majority gives a wave-of-the-hand dismissal to the carefully reasoned decision in Johnson.[25]  Our decision in Johnson followed the trajectory established by our earlier decision in Hughes v. State, 901 So. 2d 837 (Fla. 2005), which applied a Witt analysis to conclude that the decision in Apprendi[26]—which unquestionably spawned both Ring and Hurst v. Florida— should not be applied retroactively.  The majority acknowledges that "in holding our statute unconstitutional, the United States Supreme Court applied the exact reasoning of Ring to Florida's death penalty sentencing scheme."  Majority op. at

---

25.  Prior to Johnson, various justices had expressed the view that Ring should not be given retroactive application.  See, e.g., Monlyn v. State, 894 So. 2d 832, 841 (Fla. 2004) (Pariente, C.J., specially concurring) ("Applying Witt's retroactivity test . . . I conclude that Ring is not among the 'fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding.'  Witt, 387 So. 2d at 929.  As a decision that bears only on the procedure in which eligibility for the death penalty is determined without altering the burden of proof or otherwise increasing the accuracy or fairness of the proceedings, Ring is an evolutionary refinement in capital jurisprudence." (citing Schriro v. Summerlin, 542 U.S. 348 (2004))).

26.  Apprendi v. New Jersey, 530 U.S. 466 (2000).

39. But the majority also asserts without explanation that in <u>Johnson</u> "we did not properly analyze the purpose of the new rule in <u>Ring</u>, which was to protect the fundamental right to a jury in determining each element of an offense." Majority op. at 46 (quoting <u>Asay v. State</u>, Nos. SC16-223, SC16-102, & SC16-628 (slip op. issued Fla. Dec. 22, 2016) (plurality opinion)). The detailed reasoning of <u>Johnson</u> concerning "the purpose of the new rule" is rejected without any discussion of that reasoning. Indeed, the majority refuses to address any of the reasoning of <u>Johnson</u>—which held that <u>Ring</u> was an evolutionary refinement in the law and that all three prongs of the <u>Stovall</u>/<u>Linkletter</u>[27] three-part test weighed heavily against retroactive application of <u>Ring</u>. This is not the way any court should treat a carefully reasoned precedent.

Similarly, the majority omits any mention of <u>Witt</u>'s undergirding principle—which informed our decisions in <u>Johnson</u> and <u>Hughes</u>—that retroactive application is unwarranted "in the absence of fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding." <u>Witt</u>, 387 So. 2d at 929. In <u>Hughes</u>, focusing on this central element of the <u>Witt</u> framework, we explained the nature of the new rule announced in <u>Apprendi</u>:

---

27. <u>Stovall v. Denno</u>, 388 U.S. 293 (1967); <u>Linkletter v. Walker</u>, 381 U.S. 618 (1965).

> Apprendi shifted certain fact-finding from judge to jury and "clarified and extended" the right to a jury trial to require the State to prove convictions beyond a reasonable doubt by applying the standard to certain factors affecting sentencing under certain conditions. United States v. Mora, 293 F.3d 1213, 1219 (10th Cir.), cert. denied, 537 U.S. 961 (2002). But Apprendi does not impugn the "very integrity of the fact-finding process" or present "the clear danger of convicting the innocent." Johnson v. New Jersey, 384 U.S. 719, 728 (1966) (quoting Linkletter, 381 U.S. at 639).

Hughes, 901 So. 2d at 844. In support of our conclusion that Ring should not be given retroactive application, we reached a similar conclusion in Johnson concerning the nature of the rule announced in Ring. See Johnson, 904 So. 2d at 410.

The majority simply fails to consider whether the rule announced in Hurst v. Florida "cast[s] serious doubt on the veracity or integrity," Witt, 387 So. 2d at 929, of the many penalty phase proceedings that the majority now sweeps aside. The majority opinion will be searched in vain for any mention—much less an analysis—of the implications of the new rule for the "veracity or integrity" of those proceedings, which is an integral part of the Witt framework, and figures prominently in the evaluation of the purpose of a new rule under the first prong of our Witt analysis. Id.

Similarly, our retroactivity analysis here should be informed by Johnson's categorization of Ring as an "evolutionary refinement" and thus a new rule that should not be given retroactive application under the Witt framework. Johnson,

904 So. 2d at 405.  In <u>Witt</u> we held that "evolutionary refinements in the criminal law" including new rules "affording new or different standards for . . . procedural fairness . . . do not compel an abridgement of the finality of judgments."  <u>Witt</u>, 387 So. 2d at 929.  In <u>Hughes</u>, we recognized that <u>Apprendi</u> had "announced an emerging right of procedural fairness that does not compel the disruption of final judgments."  <u>Hughes</u>, 901 So. 2d at 844.  And in <u>Johnson</u> we stated: "<u>Ring</u> was not a sudden or unforeseeable development in constitutional law; rather, it was 'an evolutionary refinement in capital jurisprudence.' "  <u>Johnson</u>, 904 So. 2d at 405 (quoting <u>Monlyn v. State</u>, 894 So. 2d 832, 841 (Fla. 2004) (Pariente, C.J., specially concurring)).

If <u>Ring</u>—which involved an application of the logic of <u>Apprendi</u> notwithstanding <u>Apprendi</u>'s disavowal of any application to capital sentencing— was an evolutionary refinement, it necessarily follows that <u>Ring</u>'s application in <u>Hurst v. Florida</u>, which according to the majority "applied the exact reasoning of <u>Ring</u>," majority op. at 39, also is an evolutionary refinement.  The majority, of course, omits any mention of our conclusion in <u>Johnson</u> that <u>Ring</u> was an evolutionary refinement, since the majority gives no attention to the analysis contained in <u>Johnson</u>.

In <u>Johnson</u>, we highlighted <u>Witt</u>'s recognition that "once a conviction has been upheld on appeal, the State acquires a strong interest in finality."  <u>Johnson</u>,

904 So. 2d at 407. As we stated in Witt: "The importance of finality in any justice system, including the criminal justice system, cannot be understated." Witt, 387 So. 2d at 925. But the majority here does not acknowledge the State's strong interest in finality—an interest that is paralleled by the interest of victims' families—in the postconviction context. The majority's conclusory deliverances on the three prongs of the Stovall/Linkletter test adopted in Witt give no consideration to the circumstances that we held in Johnson strongly weighed against thwarting the State's interest in the finality of death sentences.

Admittedly, the scope of the holding in Hurst v. Florida goes beyond anything contemplated by the Johnson Court when it determined that Ring should not be applied retroactively. In Johnson we observed that Ring claims had "[u]sually . . . failed because the sentence was supported by an aggravating factor found by a jury beyond a reasonable doubt, such as a prior violent felony conviction or a contemporaneous enumerated felony conviction" and stated that "[w]e could easily dispose of Johnson's Ring claim in the same way because his death sentence was supported by an aggravating factor found by a jury beyond a reasonable doubt—namely, his prior convictions of two violent felonies." Johnson, 904 So. 2d at 406. As I have explained, that basis for resolving Ring claims remains a basis for resolving—that is, rejecting—Hurst v. Florida claims. But even under the broader "interpretation" of Hurst v. Florida adopted by the

- 71 -

majority, <u>Johnson</u>'s analysis of the three-part test still identifies the considerations that are relevant to determining whether retroactive effect should be given to a new rule defining the way the Sixth Amendment must be applied to penalty phase proceedings.  Those considerations weigh decisively against retroactive application.

**A.**

The first prong of the test we employed in <u>Witt</u> focuses on "the purpose to be served" by the new rule.  <u>Johnson</u>, 904 So. 2d at 409 (citing <u>Witt</u>, 387 So. 2d at 926).  In <u>Johnson</u>, we analyzed this factor based on elements of the reasoning of the United States Supreme Court in <u>Schriro v. Summerlin</u>, 542 U.S. 348, 358 (2004), which held for purposes of federal law that "<u>Ring</u> announced a new procedural rule that does not apply retroactively to cases already final on direct review."  We specifically emphasized the "Supreme Court's characterization of the purpose of <u>Ring</u>," and stated that "[t]o the extent that the purpose of <u>Ring</u> is a factor in our own retroactivity test, a recent discussion of that purpose by the very Court that decided <u>Ring</u> is obviously worthy of our attention and deference." <u>Johnson</u>, 904 So. 2d at 410 n.4.  We pointed out that "[t]he Supreme Court cautioned in <u>Ring</u> that its determination of who decides whether a defendant is eligible for the death penalty 'does not turn on the relative rationality, fairness, or efficiency of potential factfinders,' " <u>id.</u> at 409-10 (quoting 536 U.S. at 607), and

that "[t]he Court subsequently stated in <u>Summerlin</u> that 'for every argument why juries are more accurate factfinders, there is another why they are less accurate,' " <u>id.</u> at 410 (quoting 124 S. Ct. at 2525).

Based on the reasoning of <u>Summerlin</u>, we went on to state that "[t]he purpose of the new rule in <u>Ring</u> is to conform criminal procedure to the Sixth Amendment's jury trial guarantee, and not to enhance the fairness or efficiency of death penalty procedures." <u>Id.</u> We further relied on our decision "[i]n <u>Williams v. State</u>, 421 So. 2d 512, 515 (Fla. 1982), [in which] we refused to apply a rule retroactively in part because it 'did not involve an attack on the fairness of the trial.' " <u>Id.</u> We also invoked <u>Witt</u>'s statement that retroactive application is inappropriate "in the absence of fundamental and constitutional law changes which cast serious doubt on the veracity or integrity of the original trial proceeding," <u>id.</u> (quoting <u>Witt</u>, 387 So. 2d at 929), and determined that "<u>Ring</u> casts no such doubt," <u>id.</u> We held that "[t]he first <u>Witt</u> factor therefore disfavors retroactive application." <u>Id.</u>

In <u>Summerlin</u>, the Supreme Court also relied on the pre-<u>Teague</u>[28] retroactivity analysis in <u>DeStefano v. Woods</u>, 392 U.S. 631 (1968) (per curiam).

---

28. <u>Teague v. Lane</u>, 489 U.S. 288 (1989) (plurality opinion). I agree with Justice Polston that the framework established in <u>Teague</u> is more workable than <u>Witt</u>. See <u>Asay v. State</u>, Nos. SC16-223, SC16-102, & SC16-628 (slip op. issued Fla. Dec. 22, 2016) (Polston, J., concurring); <u>see also</u> <u>Johnson v. State</u>, 904 So. 2d 400, 413 (Fla. 2005) (Cantero, J., concurring) (explaining that this Court should

Applying a test identical to the <u>Witt</u> three-part test, <u>DeStefano</u> denied retroactive effect to <u>Duncan v. Louisiana</u>, 391 U.S. 145 (1968), which held that the Sixth Amendment's jury-trial guarantee was applicable to the States. <u>Summerlin</u> explained the reasoning of <u>DeStefano</u> concerning the purpose served by <u>Duncan</u>:

> We noted [in <u>DeStefano</u>] that, although "the right to jury trial generally tends to prevent arbitrariness and repression[,] . . . '[w]e would not assert . . . that every criminal trial—or any particular trial—held before a judge alone is unfair or that a defendant may never be as fairly treated by a judge as he would be by a jury.' " 392 U.S., at 633-634 (quoting <u>Duncan</u>, <u>supra</u>, at 158). We concluded that "[t]he values implemented by the right to jury trial would not measurably be served by requiring retrial of all persons convicted in the past by procedures not consistent with the Sixth Amendment right to jury trial." 392 U.S., at 634.

<u>Summerlin</u>, 542 U.S. at 357 (second, third, and fourth alterations in original). <u>Summerlin</u> concluded that "[i]f under <u>DeStefano</u> a trial held entirely without a jury was not impermissibly inaccurate, it is hard to see how" the Sixth Amendment violation condemned in <u>Ring</u> could result in such "impermissibly inaccurate" proceedings. <u>Id.</u>; <u>see also</u> <u>Washington v. State</u>, 907 So. 2d 512, 516 (Fla. 2005) (Lewis, J., concurring) ("[T]he purpose served by a new rule of law is a key factor in determining retroactivity in Florida, and the United States Supreme Court in <u>DeStefano</u> held that the purpose served by the jury-trial guarantee ('to prevent

_____

apply the <u>Teague</u> standard when determining the retroactivity of United States Supreme Court decisions). But here, analysis under <u>Witt</u> is sufficient to resolve the retroactivity issue.

- 74 -

arbitrariness and repression') 'favor[s] only prospective application' of that guarantee to the states. Therefore, I cannot logically say that the purpose served by the jury fact-finding requirement of Apprendi and Ring favors a different treatment in this regard." (second alteration in original) (footnotes omitted)).

The majority here quietly brushes all this aside—with no explanation of why the reasoning is either wrong or inapplicable—and delivers an analysis under which any new rule regarding the scope of the Sixth Amendment may be deemed to have a purpose that supports retroactive application.

**B.**

The second prong addresses "the extent of reliance on the prior rule." Johnson, 904 So. 2d at 409 (citing Witt, 387 So. 2d at 926). In Johnson, we concluded that this factor "[l]ike the first factor . . . weighs heavily against retroactive application of Ring" because "Florida has relied to an immeasurably large extent on its capital sentencing scheme." Id. at 410. In Johnson we also emphasized that the State's reliance on the precedents that upheld the validity of Florida's death penalty statute was entirely reasonable: "Based on all of the information available at the time of Ring, Florida had every reason to believe that its capital sentencing scheme was constitutionally sound and worthy of reliance." Id. at 411. The State continued to reasonably rely to "an immeasurably large extent," id. at 410, on the undisturbed holdings of Hildwin and Spaziano

throughout the entire fourteen-year period between the decision in <u>Ring</u> and the decision in <u>Hurst v. Florida</u>—a period in which both this Court and the Supreme Court time after time rejected claims challenging Florida's death penalty statute under <u>Ring</u>.

The majority does not question the extent of the State's reliance on <u>Hildwin</u> and <u>Spaziano</u> after <u>Ring</u> issued. Nor does the majority question the good faith of the State—or this Court—in its post-<u>Ring</u> reliance on those precedents. Instead, the majority changes the subject. The majority states that "[w]e now know after <u>Hurst v. Florida</u> that Florida's capital sentencing statute was unconstitutional from the time that the United States Supreme Court decided <u>Ring</u>" and that "it is undeniable that <u>Hurst v. Florida</u> changed the calculus of the constitutionality of capital sentencing in this State." Majority op. at 57. From this, the majority concludes that the extent-of-reliance-on-the-prior-rule factor "weighs in favor of granting retroactive relief to the point of the issuance of <u>Ring</u>." Majority op. at 57. But this is a non sequitur. The fact that "<u>Hurst v. Florida</u> changed the calculus of the constitutionality of capital sentencing," majority op. at 57, in Florida has no bearing on the extent of the State's reliance on the old rule. Any case announcing a new rule necessarily "change[s] the calculus," majority op. at 57, of the applicable law. By relying on this truism as the basis for its analysis, the majority renders this prong of the <u>Witt</u> test meaningless.

**C.**

The third prong addresses "the effect that retroactive application of the new rule would have on the administration of justice." Johnson, 904 So. 2d at 409 (citing Witt, 387 So. 2d at 926). The majority errs in concluding that the "analytical lynchpin" of this factor "is whether holding a decision retroactive would have the effect of burdening 'the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit.' " Majority op. at 58 (quoting Witt, 387 So. 2d at 929-30). The majority suggests that this supposed "analytical lynchpin" is used "to distinguish between 'jurisprudential upheavals' and 'evolutionary refinements.' " Majority op. at 58 (quoting Witt, 387 So. 2d at 929). From this the majority fashions a rule that the third prong will weigh against retroactive application only if the effect of the new rule will burden the administration of justice "beyond any tolerable limit." Majority op. at 58 (quoting Witt, 387 So. 2d at 930). But this twists the reasoning of Witt beyond recognition.

The point Witt actually makes is that frequently occurring "evolutionary refinements in the criminal law"—as opposed to rare "jurisprudential upheavals" like Gideon v. Wainwright[29]—should not be given retroactive effect because doing

---

29. Gideon v. Wainwright, 372 U.S. 335 (1963) (holding that each state must provide counsel to every indigent defendant charged with a felony at all critical stages of the proceeding).

so would strain the system of justice "beyond any tolerable limit." Witt, 387 So. 2d at 929-30. From this sensible point concerning the drastic impact of giving retroactive application to all evolutionary refinements—which by their nature occur with great frequency—the majority makes an unreasoned analytical hop to the wholly unwarranted conclusion that concerns about avoiding undue strains on the administration of justice come into play only when retroactive application will strain the system of justice "beyond any tolerable limit." Majority op. at 58 (quoting Witt, 387 So. 2d at 930). In an exercise of fallacious reasoning, the majority thus turns an impact that is sufficient to count against retroactive application into an impact that is necessary to count against retroactive application. But even under the test fallaciously set up by the majority, the strain on the system of justice inflicted by giving retroactive effect to the majority's misinterpretation of Hurst v. Florida is "beyond any tolerable limit." Witt, 387 So. 2d at 930.

In Johnson, we concluded that applying "Ring retroactively in Florida . . . would consume immense judicial resources without any corresponding benefit to the accuracy or reliability of penalty phase proceedings." Johnson, 904 So. 2d at 412. The same conclusion applies concerning retroactive application of Hurst v. Florida. While the system is processing new death cases, the system will also be burdened with new penalty phase proceedings for the vast majority of the death cases that became final after Ring issued in 2002. The difficulties involved in

conducting new penalty phase proceedings for such a large number of cases involving murders committed over such an extended period of time truly beggars description. The impact on the system of justice—courts, prosecutors, and public defenders—will be enormous. Contrary to the majority's suggestion, that impact is not rendered insignificant by the fact that giving full retroactivity would have a greater impact. This factor—as in Johnson—weighs strongly against retroactive application.

### III.

I would also reject the majority's reliance on James v. State, 615 So. 2d 668 (Fla. 1993). First, James cannot be reconciled with the balancing process required by Witt. The majority itself recognizes that "balancing fairness versus finality is the essence of a Witt retroactivity analysis." Majority op. at 46 (emphasis added). But in applying James, the majority forsakes the "essence" of retroactivity analysis by jettisoning any thought of the State's interest in finality—no matter how weighty that interest might be. Although James applied a new rule retroactively, it gave no consideration to the framework for retroactivity established in Witt. James said not one word about Witt. In ignoring Witt, James totally disregarded the State's strong interest in finality in the postconviction context. A decision that simply ignored existing precedent will rarely be entitled to any more weight as a precedent than the weight it afforded to the authority it ignored.

Second, the supposed rule of "fundamental unfairness" articulated in <u>James</u> is deeply problematic—if not entirely incoherent—when judged by its own terms. If counsel accepted our decisions at face value and relied on the United States Supreme Court's repeated rejection of <u>Ring</u> claims, the client loses under <u>James</u>. But if counsel raised claims that had been consistently rejected, the client wins. This hardly comports with the notion of fundamental fairness. The concept of fundamental error is based on the recognition that some matters are so important that it is fundamentally unfair for the client to suffer as a result of counsel's oversight. But <u>James</u> says that it is fundamentally fair for a defendant to suffer because counsel had insufficient foresight.

<u>James</u> should be abrogated.

## IV.

The new rule articulated in <u>Hurst v. Florida</u>—which simply requires that the jury find an aggravator—is an evolutionary refinement in the law that does not cast doubt on the veracity or integrity of penalty phase proceedings resulting in death sentences that are now final. Nothing in our retroactivity jurisprudence warrants setting aside the State's weighty interest in the finality of these sentences. The State's reliance on the old rule—as articulated in <u>Hildwin</u> and <u>Spaziano</u>—was undeniably immense and entirely in good faith. Based on an indefensible misreading of <u>Hurst v. Florida</u> and a retroactivity analysis that leaves the <u>Witt</u>

- 80 -

framework in tatters, the majority unjustifiably plunges the administration of the death penalty in Florida into turmoil that will undoubtedly extend for years. I strongly dissent from this badly flawed decision.

POLSTON, J., concurs.

PERRY, J., concurring in part and dissenting in part.

I concur with the majority's decision to affirm the postconviction court's denial of relief as it pertains to Mosley's convictions and to deny all claims except Mosley's claim pursuant to Hurst v. Florida, 136 S. Ct. 616 (2016), in Mosley's petition for a writ of habeas corpus. Because I believe that Hurst v. Florida retroactively applies to all capital defendants irrespective of the date on which the defendant's death sentence became final, I likewise concur in the majority's determination that the United States Supreme Court's decision both applies to Mosley and requires that we vacate his death sentence. See Asay v. State, SC16-223, slip op. at 71 (Fla. Dec. 22, 2016) (Perry, J., dissenting).

However, because Florida law requires that Mosley be sentenced to life in prison as a consequence of his unconstitutional death sentence, I disagree with the majority's decision to remand for a new penalty phase proceeding instead of remanding for imposition of a life sentence. See § 775.082(2), Fla. Stat. (2016).

As I explained fully in Hurst v. State, 202 So. 3d 40, 75-76 (Fla. 2016) (Perry, J., concurring in part and dissenting in part), there is no compelling reason

for this Court not to apply the plain language of section 775.082(2), Florida Statutes. Because the majority of this Court has determined that Mosley's death sentence was unconstitutionally imposed, Mosley is entitled to the clear and unambiguous statutory remedy that the Legislature has specified:

> In the event the death penalty in a capital felony is held to be unconstitutional by the Florida Supreme Court or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death for a capital felony shall cause such person to be brought before the court, and <u>the court shall sentence such person to life imprisonment</u> as provided in subsection (1).

See § 775.082(2), Fla. Stat. (emphasis added). The plain language of the statute does not rely on a specific amendment to the United States Constitution, nor does it refer to a specific decision by this Court or the United States Supreme Court. Further, it does not contemplate that all forms of the death penalty in all cases must be found unconstitutional. Instead, the statute uses singular articles to describe the circumstances by which the statute is to be triggered. Indeed, the statute repeatedly references a singular defendant being brought before a court for sentencing to life imprisonment. I consequently cannot agree that the statute was intended as a fail-safe mechanism for when this Court or the United States Supreme Court declared that the death penalty was categorically unconstitutional. Cf. Hurst v. State, 202 So. 3d at 66.

Two Cases:

An Appeal from the Circuit Court in and for Duval County,
        Michael R. Weatherby, Judge - Case No. 162004CF006675AXXXMA
And an Original Proceeding – Habeas Corpus

Richard Adam Sichta, Susanne Kaye Sichta, and Joseph Stewart Hamrick of The
Sichta Firm, LLC, Jacksonville, Florida,

        for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, and Carine L. Mitz, Assistant Attorney
General, Tallahassee, Florida,

        for Appellee/Respondent